## LUCKENBACH ET AL. *v.* W. J. McCAHAN SUGAR REFINING COMPANY AND THE INSULAR LINE.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 51.   Argued November 18, 1918.—Decided December 9, 1918.

Where the bills of lading stipulated that the carrier should have the benefit of any insurance that might be effected by the shipper, but the shipper's policies provided that the insurers should not be liable for merchandise shipped under bills containing such stipulations or in the possession of any carrier who might be liable for its loss or damage, *held*, that an arrangement between the insurers and the shipper, whereby the former loaned to the latter the amount of a loss caused by the carrier's negligence, to be repaid only in so far as the shipper recovered from the carrier, otherwise to operate in effect as absolute payment under the policies, and whereby, as security, the shipper pledged such prospective recovery and the bills of lading and agreed to prosecute suit against the carrier at the expense and under the exclusive direction and control of the insurers,—was a lawful arrangement; that the loan was not a payment of the insurance and the carrier was not entitled to the benefit of it; and that a libel

brought in the shipper's name, for the benefit of the insurers, pursuant to the agreement, could be maintained against the carrier and the ship. P. 148.

Liability for unseaworthiness, resting on the personal contract of the shipowner, is not limited by Rev. Stats., § 4283, or the Act of June 26, 1884. P. 149.

A time charter characterizing the vessel as "tight, staunch, [and] strong," on delivery, and binding the owners to "maintain her in a thoroughly efficient state in hull and machinery for and during the service," imports a warranty, without limitation, of seaworthiness, not merely at delivery, but at the commencement of every voyage. P. 150.

A time charter, like a charter for a single voyage, is not a demise of the ship, and leaves the charterer without control over her maintenance and repair, though liable without limitation to shippers for losses due to unseaworthiness discoverable by the exercise of due diligence on the part of the owners. Id.

A charter party was signed by but one of the owners, but the rest, being impleaded with him, admitted that he acted for all, and the liability of all, if liability existed, was not controverted. Held, that a decree for damages should run against all. P. 151.

235 Fed. Rep. 388, modified and affirmed.

THE case is stated in the opinion.

Mr. Roscoe H. Hupper, with whom Mr. Peter S. Carter and Mr. Charles C. Burlingham were on the brief, for petitioners:

In this case (unlike Pennsylvania R. R. Co. v. Burr, 130 Fed. Rep. 847, and Bradley v. Lehigh Valley R. R. Co., 153 Fed. Rep. 350), we have complete evidence of the intentions of the underwriters when the moneys were advanced. The effect is to make the payments unconditional payments of insurance.

It may be that the cargo owners' acceptance of the bill of lading broke the warranty, and that the insurance companies could have refused to pay; but it is clear that any breach was waived and was always intended to be waived. This waiver cannot convert into something other

than insurance the money which the cargo owners received in return for their insurance premiums. So far as the carrier is concerned, there need have been no insurance policies at all, and it matters not in what form or under what arrangement the money is paid the cargo owner, so long as it is in fact a payment to him for his own benefit.

The only conclusion to be reached on the whole evidence is that there was an unconditional payment of insurance. This case is distinguished from *Inman* v. *South Carolina Ry. Co.*, 129 U. S. 128. The insurance companies' right to demand repayment of the "loan" is merely their right of subrogation parading in disguise. The value of the two rights is the same: the amount received from the carrier. They depend upon the same condition: liability of the carrier. The only distinction is in name.

Since the insurance companies made their "loan" agreements with the cargo owners after they knew the latter were bound by contract to give the carrier the benefit of insurance, their rights are subordinate to those of the carrier, by analogy with the rule in equity that a second assignee taking with notice of the rights of a prior assignee is postponed. See Pomeroy's Equity Jurisprudence, 3d ed., §§ 713, 715. The situation is also similar to that presented by a prior equity, uniformly held to be a burden on the legal estate. *Id.*, § 730; *Great Lakes & St. L. T. Co.* v. *Scranton Coal Co.*, 239 Fed. Rep. 603, 609.

The authorities hold that the so-called "loans" are payments of insurance. Our contentions are supported by *Roos* v. *Philadelphia, Wilmington & Baltimore R. R. Co.*, 199 Pa. St. 378; *Lancaster Mills* v. *Merchants Cotton Press Co.*, 89 Tennessee, 1; *Deming & Co.* v. *Merchants Cotton Press Co.*, 90 Tennessee, 310.

The Limited Liability Statute applies to every case of liability on account of the vessel where the owner is free

from privity or knowledge. There is no principle of construction to justify the exclusion of specific cases falling within the language of the statute, which has always been liberally construed. That the statute contemplated contracts is made clear by the reference to property, goods and merchandise shipped or put on board the vessel, and by the reference in § 4286, Rev. Stats., to the chartering of a vessel. When the Limited Liability Act was passed in 1851, the transportation of goods was always pursuant to contract, just as now, either by bill of lading or charter-party, to which the warranties of seaworthiness attached. Ships do not move and no service is performed with or by means of ships except by virtue of a contract, or an agreement on the part of the shipowner, and therefore the personal contract doctrine could be applied to prevent limitation of liability in every case, as to carriage of passengers and cargo.

This case is not similar to those where limitation of liability has been denied because of a "personal contract." *Great Lakes Towing Co.* v. *Mills Transportation Co.*, 155 Fed. Rep. 11; *The Loyal*, 204 Fed. Rep. 930; *The Amos D. Carver*, 35 Fed. Rep. 665, and *Richardson* v. *Harmon*, 222 U. S. 96, 106, illustrate the meaning of "personal contract," and show that a personal contract is one to be performed by the owner entirely irrespective of the vessel. *Benner Line* v. *Pendleton*, 217 Fed. Rep. 497; 246 U. S. 353, involved a voyage charter-party containing a provision that the vessel should be "tight, staunch, strong, and in every way fitted" for the voyage, and the loss was found to have resulted from unseaworthiness existing when the schooner began the voyage. In this case the seaworthiness of the Julia Luckenbach when delivered under the time charter cannot be questioned. We cannot believe that the right to limitation depends on the accident of who signs the charter; it depends on the nature of the contract. Limitation has been granted notwithstand-

ing contracts which were as much personal contracts as the charter-party in the case at bar. See *The Republic,* 57 Fed. Rep. 240, affd. 61 Fed. Rep. 109; *LaBourgogne,* 144 Fed. Rep. 781, affd. 210 U. S. 95; *The Jane Grey,* 99 Fed. Rep. 582, 585.

*Mr. Lawrence Kneeland* for the W. J. McCahan Sugar Refining Co., respondent.

*Mr. J. Parker Kirlin,* with whom *Mr. Mark W. Maclay, Jr.,* was on the brief, for the Insular Line, respondent:

The provision in the contract of carriage, that the carrier was to receive the benefit of any insurance, is valid, and prevents either the owner or insurer from maintaining an action against the carrier upon any terms inconsistent therewith. *Phœnix Insurance Co.* v. *Erie & Western Transportation Co.,* 117 U. S. 312, 325.

If the warranties had any effect at all, it was to avoid the policies when the libelant accepted the bill of lading with the provision giving the carrier the benefit of insurance. *Carstairs* v. *Mechanics Insurance Co.,* 18 Fed. Rep. 473; *Inman* v. *South Carolina Ry. Co.,* 129 U. S. 128. Payment of the loss with full knowledge of the facts was a waiver. The transaction was intended, and operated, as a final settlement with the insured.

The so-called loan receipts do not evidence any loan justly so described, but merely secure to the insurers their ordinary rights of subrogation upon payment. In equity subrogation accrues to the insurer without any express stipulation, and he may assert it in his own name.

By making the advance and entering into the agreement the insurer adjusted and paid the loss as between him and the assured, and the whole transaction was at an end. It is in this respect that the case at bar differs from *Inman* v. *South Carolina Ry. Co.,* 129 U. S 128. The insurer's right of subrogation is limited by the benefit of insurance

clause in the bill of lading. *Wager v. Providence Insurance Co.,* 150 U. S. 99, 108.

MR. JUSTICE BRANDEIS delivered the opinion of the court.

The W. J. McCahan Sugar Refining Company shipped a cargo of sugar from Porto Rico to Philadelphia by the Julia Luckenbach, which was under charter to the Insular Line; and the cargo suffered severe damage.  In the District Court of the United States for the Southern District of New York, a libel seeking damages was filed in the name of the shipper *in personam* against the Insular Line and *in rem* against the steamer.  It alleged that the damages resulted from unseaworthiness of the hull, existing at the commencement of the voyage.  The petitioners, owners of the ship, were impleaded.  The bills of lading sued on contained a clause relieving the carrier from liability for damages arising from "any latent defect in hull, . . . .  or by unseaworthiness of the ship, even existing at time of shipment, or sailing on the voyage, but not discoverable by the exercise of due diligence by the ship owner or manager; . . ."

The libel alleged that the unseaworthiness would have been discovered, had due diligence been exercised.  The District Court so found and held that the libelant was entitled to recover.  The damages were agreed to be $87,526.65, with interest; and the value of the ship and pending freight was found or agreed to be $66,600.  The owners duly moved for limitation of liability.  The District Court found that the damages sustained were occasioned without the privity or knowledge of the owners; held that they were entitled to limit their liability, both as against the shipper and as against the charterer, who claimed indemnity; and ordered that the owners should pay the shipper's claim to the extent of the value of the

ship and pending freight; and that the balance should be paid by the Insular Line. 235 Fed. Rep. 388. Both the owners and the Insular Line appealed to the Circuit Court of Appeals. That court modified the decree, so as to award that payment of the full amount be made to the shipper primarily by the steamer and the owners; and that the charterer should be called upon to make payment only of the deficiency, if any. 235 Fed. Rep. 388. The case comes here on writ of certiorari granted on the petition of the owners. 242 U. S. 638.

It is urged, on three grounds, that the decision of the Circuit Court of Appeals should be reversed and that the District Court should be directed, either to dismiss the libel or to limit the owners' liability to the value of the ship and pending freight.

*First.* The owners contend that both lower courts erred in holding that the steamer was unseaworthy at the commencement of her voyage and that due diligence to make her seaworthy had not been exercised. The issue involved is one of fact; and no reason appears why the general rule should not apply, that concurrent decisions of the two lower courts on an issue of fact will be accepted by this court unless shown to be clearly erroneous. *The Wildcroft,* 201 U. S. 378, 387; *The Carib Prince,* 170 U. S. 655, 658.

*Second.* The owners (and also the charterer) contend that the libel should be dismissed, because the shipper had already been compensated for the loss by insurance which it effected; and that the carrier is entitled to the full benefit of this insurance.

The shipper had effected full insurance. The bills of lading sued on contain the following clause:

"In case of any loss, detriment or damage done to or sustained by said goods or any part thereof for which the carrier shall be liable to the shipper, owner or consignee, the carrier shall to the extent of such liability have the

full benefit of any insurance that may have been effected upon or on account of said goods."

Such a clause is valid, because the carrier might himself have insured against the loss, even though occasioned by his own negligence; and if a shipper under a bill of lading containing this provision effects insurance and is paid the full amount of his loss, neither he nor the insurer can recover against the carrier. *Phœnix Insurance Co.* v. *Erie & Western Transportation Co.*, 117 U. S. 312; *Wager* v. *Providence Insurance Co.*, 150 U. S. 99. In the case at bar, the shipper has received from the insurance companies an amount equal to the loss; but it is contended that the money was received as a loan or conditional payment merely, and that, therefore, the carrier is not relieved from liability. The essential facts are these:

The policies under which the shipper was insured contained the following, or a similar, provision:

"Warranted by the assured free from any liability for merchandise in the possession of any carrier or other bailee, who may be liable for any loss or damage thereto; and for merchandise shipped under a bill of lading containing a stipulation that the carrier may have the benefit of any insurance thereon."

The situation was, therefore, this: The carrier (including in this term the charterer, the ship, and the owners) would, in no event, be liable to the shipper for the damages occasioned by unseaworthiness, *unless* guilty of negligence. The insurer would, in no event, be liable to the shipper, *if* the carrier was liable. In case the insurer should refuse to pay until the shipper had established that recovery against the carrier was not possible—prompt settlement for loss (which is essential to actual indemnity and demanded in the interest of commerce) would be defeated. If, on the other hand, the insurers should settle the loss, before the question of the carrier's

liability for loss had been determined, the insurer would lose the benefit of all claims against the carrier, to which it would be subrogated in the absence of a provision to the contrary in the bill of lading, *The "Potomac,"* 105 U. S. 630, 634; and the carrier would be freed from liability to any one. In order that the shipper should not be deprived of the use of money which it was entitled to receive promptly after the loss, either from the carrier or from the insurers, and that the insurer should not lose the right of subrogation, agreements in the following (or similar) form were entered into between the insurers and the shipper:

"New York, Aug. 15, 1912.

"Received from the Federal Insurance Company, Twenty-three hundred four and 16/100 dollars, as a loan and repayable only to the extent of any net recovery we may make from any carrier, bailee or others on account of loss to our property (described below) due to damage on S/S Julia Luckenbach from Porto Rico/Philadelphia, on or about ———— ————, 190—, or from any insurance effected by any carrier, bailee or others on said property, and as security for such repayment we hereby pledge to the said Federal Insurance Company, the said recovery and deliver to them duly endorsed the bills of lading for said property and we agree to enter and prosecute suit against said railroad, carrier, bailee, or others on said claim with all due diligence at the expense and under the exclusive direction and control of the said Federal Insurance Company.

The W. J. McCahan Sugar Refining Co.,

$2,304.16                  R. S. Pomeroy, *Treasurer.*

"Description of property:—Sugar."

Upon delivery of this and similar agreements, the shipper received from the insurance companies, promptly after the adjustment of the loss, amounts aggregating

the loss; and this libel was filed in the name of the shipper, but for the sole benefit of the insurers, through their proctors and counsel, and wholly at their expense. If, and to the extent (less expenses) that, recovery is had, the insurers will receive payment or be reimbursed for their so-called loans to the shipper. If nothing is recovered from the carrier, the shipper will retain the money received by it without being under obligation to make any repayment of the amounts advanced. In other words, if there is no recovery here, the amounts advanced will operate as absolute payment under the policies.

Agreements of this nature have been a common practice in business for many years. *Pennsylvania R. R. Co.* v. *Burr*, 130 Fed. Rep. 847; *Bradley* v. *Lehigh Valley R. R. Co.*, 153 Fed. Rep. 350. It is clear that if valid and enforced according to their terms, they accomplish the desired purpose. They supply the shipper promptly with money to the full extent of the indemnity or compensation to which he is entitled on account of the loss; and they preserve to the insurers the claim against the carrier to which by the general law of insurance, independently of special agreement, they would become subrogated upon payment by them of the loss. The carrier insists that the transaction, while in terms a loan, is in substance a payment of insurance; that to treat it as if it were a loan, is to follow the letter of the agreement and to disregard the actual facts; and that to give it effect as a loan is to sanction fiction and subterfuge. But no good reason appears either for questioning its legality or for denying it effect. The shipper is under no obligation to the carrier to take out insurance on the cargo; and the freight rate is the same whether he does or does not insure. The general law does not give the carrier, upon payment of the shipper's claim, a right by subrogation against the insurers. The insurer has, on the other hand, by the general law, a right of subrogation against the carrier. Such claims, like tangible

salvage, are elements which enter into the calculations of actuaries in fixing insurance rates; and, at least in the mutual companies, the insured gets some benefit from amounts realized therefrom. It is essential to the performance of the insurer's service, that the insured be promptly put in funds, so that his business may be continued without embarrassment. Unless this is provided for, credits which are commonly issued against drafts or notes with bills of lading attached, would not be granted. Whether the transfer of money or other thing shall operate as a payment, is ordinarily a matter which is determined by the intention of the parties to the transaction. Compare *The Kimball*, 3 Wall. 37, 44. The insurer could not have been obliged to pay until the condition of their liability (*i. e.*, non-liability of the carrier) had been established. The shipper could not have been obliged to surrender to the insurers the conduct of the litigation against the carrier, until the insurers had paid. In consideration of securing them the right to conduct the litigation, the insurers made the advances. It is creditable to the ingenuity of business men that an arrangement should have been devised which is consonant both with the needs of commerce and the demands of justice.

*Third.* The owners contend that, under § 4283 of the Revised Statutes and § 18 of the Act of June 26, 1884, c. 121, 23 Stat. 53, 57, their liability should have been limited to the value of the ship and her pending freight; because the District Court found that her unseaworthiness was without their privity or knowledge; and this finding was not disturbed by the Circuit Court of Appeals. But the liability of the owners sought to be enforced here is one resting upon their personal contract; and to such liabilities the limitations acts do not apply. *Pendleton* v. *Benner Line*, 246 U. S. 353.

It is also urged that, as between the owners and the Insular Line, the original warranty of seaworthiness was

exhausted upon delivery of the ship to the charterers and that the maintenance clause relied upon does not import a warranty of seaworthiness at the commencement of each voyage under a time charter, but merely an obligation to pay the expense of keeping her hull and machinery in repair throughout the service. Neither the language of the clause nor the character of time charters afford support for this contention. The charter of the vessel states clearly that the vessel "being, on her delivery, tight, staunch, [and] strong" the owners will "maintain her in a thoroughly efficient state in hull and machinery for and during the service"—*not pay the expense* of maintaining her. This duty to maintain the vessel in an efficient state is imposed by the contract, because a time charter, like a charter for a single voyage, is not a demise of the ship. In both, the charterer is without control over her repair and maintenance. In operations under each the charterer becomes liable to shippers without limitation for losses due to unseaworthiness discoverable by the exercise of due diligence on the part of the owners; and in each case he requires for his protection a warranty, without limitation, of seaworthiness at the commencement of every voyage. Compare *The Burma*, 187 Fed. Rep. 94; *Whipple* v. *Mississippi & Yazoo Packet Co.*, 34 Fed. Rep. 54; *McIver & Co., Ltd.*, v. *Tate Steamers, Ltd.*, [1903] 1 K. B. 362; *Park* v. *Duncan & Sons*, 35 Scottish Law Rep. 378. If *Giertsen* v. *Turnbull & Co.*, 45 Scottish Law Rep. 916, strongly relied upon by the owners, is inconsistent with this view, it should be disregarded.

*Fourth.* The vessel was owned 54/80ths by Edgar F. Luckenbach, as sole trustee of the estate of Lewis Luckenbach; 10/80ths by Edgar F. Luckenbach, individually; and 16/80ths by John W. Weber and Hattie W. Luckenbach, executors of the estate of Edward Luckenbach. All of these parties were impleaded as owners. The charter party was signed only by "Estate of Lewis Luckenbach,

per Edgar F. Luckenbach, *Trustee;*" but it was admitted by all the petitioners that Edgar F. Luckenbach, Trustee, in so signing the charter party, acted for all the owners and intended to bind all.   The decree in the District Court declares that libelant was entitled to recovery "from the respondents Edgar F. Luckenbach et al., her owners." The decree in the Circuit Court of Appeals adjudged (presumably through inadvertence) that the payment should be made by "the Estate of Luckenbach."   The right to recover against all the owners, for the full amount, in case any of them was so liable, was not controverted. The decree of the Circuit Court of Appeals should be modified so as to render all the owners liable.   Compare *Pendleton* v. *Benner Line,* 246 U. S. 353.   As so modified, the decree is

<div align="right">

*Affirmed.*