PRICE & PIERCE, Limited, v. JARKA GREAT LAKES CORPORATION.
Civil Action No. 92.

District Court, W. D. Michigan, S. D.
April 9, 1941.

Duncan, Leckie, McCreary, Schlitz & Hinslea, of Cleveland, Ohio, and Warner, Norcross & Judd, of Grand Rapids, Mich., for plaintiff.

Kerr, Lacey & Scroggie, of Detroit, Mich., for defendant.

RAYMOND, District Judge.

Findings of Fact.

1. Plaintiff is a corporation incorporated under the laws of Great Britain. Defendant is a corporation incorporated under the laws of New York.

2. At all times material hereto, defendant controlled and operated Warehouse No. 9 in South Haven, Michigan, a city having a population of approximately 4,800.

3. On October 25, 1938, plaintiff delivered to defendant at said warehouse 5,258 bales of Greaker Sunshine Bleached Sulphite wood-pulp, which were shipped directly from Norway to South Haven and which were then in good order and condition. At the time of such delivery, defendant issued to plaintiff its non-negotiable warehouse receipt therefor, acknowledging that the bales were being held in storage for account of plaintiff.

4. On November 12, 1938, plaintiff sold said wood-pulp to The Watervliet Paper Company under a contract whereby The Watervliet Paper Company became obligated to take said pulp at the rate of 1,000 bales a month, commencing November 17, 1938. On February 3, 1939, 3,123 bales of said pulp remained at the warehouse; of which 865 bales belonged to The Watervliet Paper Company and the balance of 2,258 bales was held for account of plaintiff.

5. On February 3, 1939, a fire occurred in Warehouse No. 9, as the result of which 1,028 bales of said pulp were damaged either by fire or water, or both. Of said 1,028 damaged bales, 743 bales were for the account of plaintiff and the remainder of 285 bales belonged to The Watervliet Paper Company. Plaintiff's total claim for damages to said 743 bales is agreed to be $6,726.54, exclusive of interest.

6. On February 9, 1939, plaintiff requested delivery of said wood-pulp, but by reason of the damage thereto by fire and water, and the fact that much of the water used to extinguish the fire had frozen and formed ice over the bales, defendant was unable to, and did not, deliver said 743 damaged bales in like order and condition as when received. At that time defendant did not request plaintiff to sign any receipt for said wood-pulp, but plaintiff would have been willing to sign a receipt if requested and if the wood-pulp had been in proper order and condition. On February 9, 1939, defendant had no lien against said bales of pulp for storage charges which plaintiff was unwilling to pay, and all storage charges on said pulp were paid.

7. On February 9, 1939, and at all times prior thereto, said 743 damaged bales were owned by the manufacturer, which was Aktieselskabet Greaker Cellulosefabrik, a Norwegian mill located at Greaker, Norway. Plaintiff acted as agent for the mill in selling its pulp. Said pulp was shipped to plaintiff on consignment. The bill of lading for same was endorsed in blank and delivered to plaintiff. Plaintiff acted as del credere agent, guaranteeing the account of the purchaser and standing the loss if the purchaser failed to pay. On occasion plaintiff made advances to the mill against the value of the shipment, but no advance was made as against said 5,258 bales of pulp.

8. At the time plaintiff made the agreement for storage with defendant and at all subsequent times until after this loss occurred, plaintiff dealt with defendant in its own name and defendant had no knowledge as to the ownership of the pulp. The warehouse receipt was issued in plaintiff's name, defendant billed plaintiff for the storage charges and plaintiff paid them.

9. Plaintiff took out insurance on said bales of wood-pulp in its own name under an open dock risk policy issued by the United States Fire Insurance Company of New York through Appleton & Cox, Inc., attorneys in fact for that company. Said policy contained this clause among others: "Warranted by the assured free from any liability for merchandise in the possession of any carrier or other bailee, who may be liable for any loss or damage thereto." Said policy also contained an endorsement whereby, in consideration of the assured's acceptance of a policy containing the above clause, the company agreed: "That in the event of loss on goods described in said stipulation, for which the bailee or carrier denies liability, we will advance to you the amount thereof as a loan without interest, the repayment thereof to be con-

ditional upon, and only to the extent of, any recovery from the carrier received by you, and we further agree that we will pay and assume all costs and expenses of any suit brought in the name of yourself or of the owner of said goods, or otherwise to enforce the liability of the carrier or bailee."

10. Following the loss, plaintiff made claim for $7,162.28 against its insurers, under said policy. Appleton & Cox, Inc., advanced to plaintiff funds in the amount of its claim in two payments, the first of $4,500 on May 5, 1939, and the second of $2,662.28 on September 29, 1939. In each case, the advance was made by means of a combination draft and enclosure memorandum which was sent by Appleton & Cox, Inc., to plaintiff's insurance broker. The draft recited that it was "in settlement of" the claim. Attached to it by perforations was the enclosure memorandum which asked that the attached forms be signed and returned. The only attached form was a loan receipt, the first one being in the following form and the second receipt being identical except as to amount and date:

"Claim #90603

"New York, May 5, 1939.

"Received from the United States Fire Insurance Company the sum of Forty-Five Hundred and 00/100 Dollars ($4500.-00) as a loan and not as payment of any claim, repayable only out of any net recovery the undersigned may make from any vessel, carrier, bailee, or others upon or by reason of any claim for the loss of or damage to the property described below, a/c Fire in Warehouse #9 at South Haven, Michigan, Feb. 3, 1939 sailing from ——— to ———, or from any insurance effected by the undersigned or by any carrier, bailee or others on said property, and as security for such payment we hereby pledge to the said insurance company all such claims and any recovery thereon.

"In further consideration of the said advance, we hereby guarantee that we are the persons entitled to enforce the terms of the contracts of transportation set forth in the bills of lading covering the said property; and we hereby appoint the agents and officers of the said Insurance Company and their successors, severally, our agents and attorneys in fact, with irrevocable power to collect any such claim and to begin, prosecute, compromise or withdraw, in our name, but at the expense of the said Insurance Company any and all legal proceedings which they may deem necessary to enforce such claim or claims, and to execute in our name any documents which may be necessary to carry into effect the purposes of this agreement.

"For Price & Pierce, Ltd.
"(Signed)  Harry A. Hughes
"Manager

"Description of Property:
"5258 bales Wood Pulp."

11. There was no assignment or other agreement taken. The procedure described in the preceding item was the usual and customary way of handling such claims and the loan receipts which were taken were in the usual form.

12. In each case plaintiff cashed the check and at the same time signed and returned the loan receipt. Plaintiff's agents understood that they had to sign the receipt in order to get the money and that the payment was made subject to the terms and conditions of said loan receipts.

13. Warehouse No. 9, in which this fire occurred, was a sheet metal warehouse about 440 feet long, 57 feet wide and 22 feet high, and rested on a cement foundation from 3 to 5 feet high. It was situated between Williams Street and a dock on the south side of Black river in South Haven. It was not fenced in but was open to the street. It had no windows. It had eight doors on the river side and nine doors on the street side. These were sliding doors which ran on an overhead track outside the building. There were no openings at the ends of the warehouse.

14. None of said doors had any locks or means of fastening them. One man could open the doors.

15. There was no automatic sprinkler system in Warehouse No. 9 and the fire equipment consisted entirely of three small hand extinguishers which were effective only if used in the early stages, before a fire got under way.

16. Defendant piled the wood-pulp solidly in Warehouse No. 9 in piles running continuously through from the river side to the street side. Different varieties of pulp were placed in different piles, but the piles were placed tightly one against the other so that the bales of pulp ran solidly from end to end of the warehouse and there were no aisles between the different kinds of pulp.

17. When the piles were first made they were about 20 feet high. Due to bales having been removed in making deliveries, at the time of the fire the pile of Greaker pulp was about 16 feet high while the varieties on each side of it were about 20 feet high. When full, the warehouse would hold about 25,000 to 30,000 bales of wood-pulp. It contained about 20,000 to 25,000 bales at the time of the fire.

18. Warehouse No. 9 was one of four warehouses operated by defendant in South Haven. Warehouses 1–4, which were grouped together as one warehouse, and the adjacent pier office were on the same side of the river as No. 9 and about half a mile to the west of it. Warehouses 7 and 8 were located directly across the river from No. 9 about a quarter of a mile away via the Dyckman Avenue bridge, and in an easterly direction from Warehouses Nos. 1–4.

19. A man located at Warehouses 1–4 could not see what was happening at Warehouses 7, 8 or 9, and vice versa. A person on the river side of No. 9 could see the river side of No. 7 and No. 8, but a person on the street side or inside No. 9 could see nothing about No. 7 and No. 8; and vice versa.

20. In the Great Lakes area as well as on the Atlantic coast it is customary to have both locks on the doors and watchmen with respect to warehouses containing wood-pulp.

21. Defendant had no employees regularly stationed in Warehouse No. 9. It had no one whose duty it was to act regularly as day watchman for Warehouse No. 9. It had no one whose sole duty it was to act as day watchman for its warehouses.

22. The only one of defendant's employees who had any duties with respect to watching its warehouses at South Haven during the day time was Elmer J. Leever. He was on duty from 8 A.M. until 12 noon and from 2 P.M. to 6 P.M. Defendant's night watchmen terminated their duties at 6 A.M., so that the warehouses had no watchman between 6 A.M. and 8 A.M. nor between 12 noon and 2 P.M.

23. Elmer J. Leever was defendant's foreman in charge of checking and loading out of and into the several warehouses. In addition to taking care of deliveries, he was instructed to prevent loitering, and to look over the buildings and keep the doors closed. While deliveries were being made, he stayed at the particular warehouse concerned for as long a time as the delivery required, which might be from a half hour to several hours depending upon the size of the delivery. He had no regular rounds to make as watchman and his visits might be several hours or more apart, depending upon his delivery duties.

24. On February 3, 1939, Elmer J. Leever spent his entire morning at Warehouses 1–4 and the adjacent pier office, taking care of two deliveries from those warehouses during the course of the morning. On that day he did not go into Warehouse No. 8 at all and was in Warehouse No. 7 only about 20 minutes. He did not visit Warehouse No. 9 until 2 o'clock in the afternoon, at which time he supervised a delivery at the easterly end of the warehouse. He was in Warehouse No. 9 only from 2 P.M. to 3 P.M., and during that entire time he was in the easterly half of the warehouse. Neither Mr. Leever nor any other employee of defendant was in Warehouse No. 9 from 3 P.M. until shortly after 6 P.M. when the fire was discovered.

25. The fire was discovered about 6:05 P.M. on February 3, 1939, by three employees of the South Haven Ice Company who were passing in one of the company's trucks. They saw the reflection of the fire through the second door from the westerly end of the Williams Street side of the building, which was partially open. The fire started about midway between the ends of the warehouse and closer to the river side than to the street side. When first discovered, the flames were from 3 to 5 feet in height and covered an area of about the same dimensions. When the fire apparatus arrived, within 5 to 8 minutes, the flames had reached the top of the building and the steel roof was cracking from the heat. The heat had become intense and the fire was beyond control by the fire department. The last hose line was not taken out of the building until February 8, 1939. The origin of the fire is unknown, but the fire was not caused by spontaneous combustion.

26. Defendant had had two other fires in its warehouses, in both of which wood-pulp was burned. One of those fires occurred at South Haven in 1933, and the other, in its warehouse at Toledo, in 1938. Defendant knew that wood-pulp was inflammable, knew that it was a commodity which, when once started, burned very

rapidly, and recognized that fire was one of the hazards which it had to guard against. Defendant made no change in the method of operation of its warehouses at South Haven after either the 1933 fire or that of 1938.

27. Defendant also recognized the danger in loiterers and instructed its watchmen to guard against them and to keep the doors of the building closed at all times when they were not actually in use. On several occasions defendant had had trouble with loiterers.

## Conclusions of Law.

1. Plaintiff is the real party in interest and entitled to maintain this action.

2. The advances made by plaintiff's insurance company were made under and pursuant to the terms of the loan receipts, which were in the usual and customary form. These advances did not constitute outright and unconditional payment, but were loans repayable only out of any net recovery that may be made against the bailee. There was no absolute assignment made and the right of action remained in plaintiff.

3. Although not the owner of the pulp, plaintiff is entitled to sue because it is the party with whom, or in whose name, the contract of storage was made for the benefit of the owner and because it is authorized to bring suit by the Uniform Warehouse Receipts Act; Comp.Laws Mich.1929, § 9564 et seq., as well as because of its special interest as del credere agent and as agent for an undisclosed principal.

4. Under the statutes of the State of Michigan, upon issuance of its warehouse receipt, defendant became obligated to redeliver the wood-pulp to plaintiff in like order and condition as when received upon demand, offer to satisfy defendant's lien as warehouseman and willingness to sign receipt for the pulp. At the time of the demand on February 9, 1939, defendant had no lien, was unable to make delivery, and did not request plaintiff to sign a receipt, and by reason of the terms of the Michigan Uniform Warehouse Receipts Act defendant has the burden of establishing a lawful excuse for such failure to redeliver.

5. In its answer filed in this action, defendant asserted that it was unable to redeliver the pulp because it was damaged by fire of unknown origin, which occurred without fault on the part of defendant, and that defendant had exercised reasonable care and vigilance to protect the wood-pulp. This is an affirmative defense and the burden of establishing same is upon the defendant.

6. Defendant has failed to sustain its burden of proving that the fire occurred without fault on its part or that it exercised reasonable care and vigilance to protect and preserve the said wood-pulp.

7. Even if the burden of proving negligence were on the plaintiff, plaintiff has established by a preponderance of the evidence that defendant was negligent, both in failing to take proper precautions for the prevention of fire and also in failing to take the proper precautions to discover the fire promptly, check it at its inception, and prevent its spread, in that, in spite of defendant's knowledge of the inflammable nature of the commodity and its awareness of the precautions which the situation required, defendant had no locks on the doors, had no adequate fire fighting equipment, had piled the pulp solidly in the warehouse without fire aisles, and had no adequate watchman service.

8. Taking the view of the evidence most favorable to defendant, its negligence continued up to the time of the fire, was a proximate cause thereof and at least contributed to produce the loss.

9. Plaintiff is entitled to recover from defendant the sum of $6,726.54, together with interest at 5% per annum from February 9, 1939, and judgment will be entered accordingly.

## Opinion.

Three important issues appear to control the result of this controversy, rendering discussion of a considerable number of subordinate questions which have been raised unnecessary.

The first issue is whether plaintiff is the real party in interest within the meaning of Rule 17(a) of Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Defendant contends that the loan receipts amount to an absolute assignment of plaintiff's rights and were not, in fact, intended to be security for any obligations owing by plaintiff to the insurance company. Rule 17(a) reads: "Real Party in Interest. Every action shall be prosecuted in the name of the real party in interest; but an executor, administrator, guardian, trustee of an express trust, a party with whom or in whose name a contract has

been made for the benefit of another, or a party authorized by statute may sue in his own name without joining with him the party for whose benefit the action is brought; and when a statute of the United States so provides, an action for the use or benefit of another shall be brought in the name of the United States."

In Moore's Federal Practice, pages 2041, 2042, it is said:

"Cases construing the real party in interest provision can be more easily understood if it is borne in mind that the true meaning of real party in interest may be summarized as follows: An action shall be prosecuted in the name of the party who, by the substantive law, has the right sought to be enforced. This meaning is the one to be desired and has been carried out in the cases. The concept of a 'real party in interest' has not been limited to one beneficially interested in the relief.

"The courts have recognized that the purpose of the provision is the liberalization of party rules, and a liberal construction will always be given to effect that purpose. * * *"

The Uniform Warehouse Receipts Act, section 9582 Compiled Laws of Michigan of 1929, provides: "Except as provided in the two (2) preceding sections and in sections nine (9) and thirty-six (36), no right or title of a third (3rd) person shall be a defense to an action brought by the depositor or person claiming under him against the warehouseman for failure to deliver the goods according to the terms of the receipt." The exceptions are inapplicable in this case. Plaintiff's insurers advanced money under loan receipts which clearly provide that the money was advanced not as payment but as a loan. The history of and practice under such receipts were fully discussed by Justice Brandeis in the case of Luckenbach v. McCahan Sugar Co., 248 U.S. 139, 148, 149, 39 S.Ct. 53, 55, 63 L.Ed. 170, 1 A.L.R. 1522. In disapproving contentions similar to those here, he said: "Agreements of this nature have been a common practice in business for many years. Pennsylvania R. R. Co. v. Burr [2 Cir.], 130 F. 847, 65 C.C.A. 331; Bradley v. Lehigh Valley R. R. Co. [2 Cir.], 153 F. 350, 82 C.C.A. 426. It is clear that if valid and enforced according to their terms, they accomplish the desired purpose. * * * The carrier insists that the transaction, while in terms a loan, is in substance a payment of insurance; that to treat it as if it were a loan, is to follow the letter of the agreement and to disregard the actual facts; and that to give it effect as a loan is to sanction fiction and subterfuge. But no good reason appears either for questioning its legality or for denying its effect. * * * In consideration of securing them the right to conduct the litigation, the insurers made the advances. It is creditable to the ingenuity of business men that an arrangement should have been devised which is consonant both with the needs of commerce and the demands of justice." See, also, Bradley v. Lehigh Valley R. Co., 2 Cir., 153 F. 350; Pacific Fire Ins. Co. v. Pennsylvania Sugar Co., 3 Cir., 72 F.2d 958; Vandervliet v. Standard Accident Insurance Co., 209 Mich. 146, 176 N.W. 574. To disregard the plain provisions of the loan receipts in construing the understanding between plaintiff and its insurer would violate fundamental principles of interpretation of contracts. It must therefore be held that plaintiff is not barred by Rule 17(a) from maintaining this action.

The second issue arises from defendant's contention that the burden of proof with respect to the issue of negligence is always on plaintiff in actions against warehousemen, and that when it is shown that loss of goods was caused by fire, mere proof of non-delivery upon demand does not make out a prima facie case for plaintiff but that he still has the burden of establishing that the fire was caused by negligence of the warehouseman. Plaintiff, on the other hand, urges that there is a distinction in this respect between actions based on tort and those which, as here, are brought on contract, and that in the latter class of cases the burden is imposed upon the defendant to establish by a preponderance of the evidence that the damage to the goods by fire did not result from lack of due care on his part.

In the circumstances of the present case, it is doubtful whether these distinctions would lead to different results. Comprehensive discussion of authorities would require many pages. The following quotations from 6 Am.Jur., Bailments, seem to indicate correctly the present state of the law upon burden of proof in such cases:

"369. In Actions Based on Breach of Contract.—Where the bailor relies upon the contract of bailment, and his right of

recovery is not construed as predicated upon the bailee's failure to exercise due care, as where he pleads simply the bailment, delivery thereunder, and failure to redeliver on demand or as agreed upon, without tendering the issue of negligence, the burden of proof to establish a breach of duty, which rests on the plaintiff throughout the trial, is merely the burden of showing the bailee's failure to perform his contract to return the property. Since the bailee is liable upon his contract in such a case unless he offers a lawful excuse for his failure to perform, where he seeks to excuse his failure to redeliver on the ground that the property was lost, destroyed, or taken out of his possession without his fault or negligence, he offers an affirmative defense, and the burden rests upon him to establish, upon the whole case, by the required degree of proof, his exercise of due care and a loss of the property notwithstanding; the ultimate burden of proving negligence in such a case should not, properly, be placed upon the bailor."

"372. * * *

"The weight of authority appears to support the rule that no presumption or inference of a bailee's negligence arises as a matter of law from the mere fact that the property, while in his possession, was destroyed by fire or stolen, even where the theft was by his own servants, in the absence of other circumstances which would support some inference of negligence. Where a bailor's allegations and proof show merely that the property was lost by such a cause and therefore not returned, there is authority to the effect that no presumption then arises to furnish a prima facie case against the bailee, and that a bailor who makes out his prima facie case by showing delivery in good condition to the bailee and a return in damaged condition, or no return at all, destroys it by going further and showing the bare fact that the damage or loss was occasioned by such a specific cause as fire or theft, and the duty of showing negligence by proof remains upon him.

"Among the modern decisions, however, an increasing number of authorities are found in support of the proposition that the bailor makes out his prima facie case notwithstanding he shows that the loss of damage occurred by reason of fire or theft, on the theory that such occurrence, while consistent with freedom from negligence on the bailee's part, may be equally consistent with negligence, is out of the ordinary course of events, does not excuse the bailee's failure to perform his contract unless in fact he exercised due care, is explainable, if at all, by facts peculiarly within the knowledge of the bailee, and should be sufficient evidence, where unexplained, to carry the case to the jury on the issue of negligence even where the bailor has the ultimate burden of proof on that issue. Thus, these authorities may be said to support the broad rule that a prima facie case is made out against a bailee by showing that property was delivered to him and cannot be returned, at least unless it appears that the impossibility of performance results from a cause as to which the bailee's fault would have been immaterial."

The pertinent provisions of the Uniform Warehouse Receipts Act are sections 9571 and 9584 of the Compiled Laws of Michigan of 1929, which read:

"9571 Warehouseman; obligation to deliver goods, failure to deliver. Sec. 8. A warehouseman in the absence of some lawful excuse provided by this act, is bound to deliver the goods upon a demand made either by the holder of a receipt for the goods or by the depositor, if such demand be accompanied with:

"(a) An offer to satisfy the warehouseman's lien;

"(b) An offer to surrender the receipt if negotiable, with such endorsements as would be necessary for the negotiation of the receipt;

"(c) A readiness and willingness to sign, when the goods are delivered, an acknowledgment that they have been delivered, if such signature be requested by the warehouseman. In case the warehouseman refuse or fail to deliver the goods in compliance with a demand by the holder or depositor so accompanied, the burden shall be upon the warehouseman to establish the existence of a lawful excuse for such refusal."

"9584 Same; liability for care of goods. Sec. 21. A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care."

While the authorities on this issue are in conflict, the court is of opinion that, in actions based on contract where the negligence of the warehouseman is no part of plaintiff's case but constitutes an affirmative defense under the pleadings, the sections above quoted place upon the warehouseman the burden to establish the existence of a lawful excuse for his refusal to deliver, and that in order to establish such lawful excuse the warehouseman must show that he was free from negligence.

However, upon consideration of the third issue, namely, whether there is evidence in the record from which a reasonable inference can be drawn that defendant was guilty of negligence which was the proximate cause of the damage to the wood-pulp, the conclusion of the court is that, even though the burden of establishing that fact were placed upon plaintiff, defendant would be liable. The more important fact situations are not in dispute. The existence of the fire was discovered by passersby about 6:05 P.M. They observed the reflection from the fire through an open door on the street side of the warehouse near the westerly end thereof. Whereupon, three men entered the warehouse through the open door and saw the fire near the center of the warehouse. It then had progressed to the extent that the flames were from three to five feet in height and covered an area of approximately the same dimensions. When the fire apparatus arrived, within five to eight minutes thereafter, the flames had reached the top of the building, and the steel roof was cracking from the heat. The heat had then become intense and the fire was beyond control by the fire department. The important conditions for consideration are those which existed at Warehouse No. 9 between three o'clock P.M. and six o'clock P.M. on the day of the fire. It is a reasonable deduction that the fire must have been started some time prior to six o'clock and at a time when the only person having any responsibilities as watchman was Elmer J. Leever, whose other duties, including checking and loading pulp out and in several widely separated warehouses, required his absence from Warehouse No. 9 for too long periods and at distances too great to enable him to discover trespassers entering the building, or to determine whether the doors were open, or to discover a fire in sufficient time to prevent it from spreading to uncontrollable proportions during his absence. Shortly before six o'clock in the afternoon, he had left his place of employment for the day, without visiting Warehouse No. 9 and without making inspection to see that the doors were closed. He was last in the warehouse at 3 P.M. He last walked past the street side of the warehouse at about 4:30 P.M. His last work for the day was at warehouses Nos. 1, 2 and 3, which were about one-half mile distant from Warehouse No. 9. It seems reasonably certain that had Leever observed the doors on the street side of Warehouse No. 9 shortly before 6:00 P.M., he would have discovered the open door and the existence of the fire in its early stages.

The precise situation which was present at Warehouse No. 9 shortly before the fire was discovered was as follows: In a city with a population of approximately 4,800, served by a fire department of volunteer firemen, Warehouse No. 9 was filled almost to capacity with bales of wood-pulp piled solidly, without isles or passageways, to a height of 15 or 20 feet. The pulp was of great value and was known to be highly inflammable when once ignited. The warehouse had nine doors opening upon the street. These doors were unlocked and the warehouse had no fencing or other protection about it. It was not equipped with a sprinkling system. The only immediately available fire equipment consisted of three small fire extinguishers which would be effective only in the very early stages of fire. It was becoming dark, and the only person who had any duties as watchman prior to 6:00 P.M. had left for his home. Ignition of the wood-pulp by spontaneous combustion was practically impossible, and it is a reasonable deduction from the record that the careless dropping of a match or cigaret would not ignite the wood-pulp. It is therefore probable that the fire was the result of intentional acts on the part of marauders.

It is the view of the court that it was negligence not only to fail to keep the doors locked, but also, if they remained unlocked, to fail to provide a watchman whose duty it was to make sufficiently frequent inspections to prevent fire from reaching the stage where it was beyond control by any available means. A part time watchman under these conditions made intrusion by

trespassers and resulting conflagrations an eventuality which could reasonably have been anticipated.

Judgment will be entered in favor of plaintiff and against defendant in the sum of $6,726.54 with interest at 5% per annum from February 9, 1939.