**EUGENE B. SMITH & CO., Inc. v. ELOY GIN CORP. et al.**

No. 13096.

United States Court of Appeals
Ninth Circuit.

April 3, 1952.

Rehearing Denied May 7, 1952.

Pope, Circuit Judge, dissented.

Fennemore, Craig, Allen & Bledsoe, Phoenix, Ariz. (Thompson, Knight, Wright, Weisberg & Simmons, Dallas, Tex., of counsel), for appellant.

Evans, Hull, Kitchel & Jenckes, Jos. S. Jenckes, Jr., Phoenix, Ariz., for appellee, Eloy Gin Corp.

Theodore G. McKesson, Robert H. Renaud, Phoenix, Ariz., for appellee Home Ins. Co.

Before MATHEWS, ORR and POPE, Circuit Judges.

ORR, Circuit Judge.

Determination of the main question on this appeal requires a construction of a written contract. Appellant asserts that the contract expresses but a portion of the agreements involved and that a subsequently executed contract controlled other portions. Appellee, Eloy Gin Corporation, to whom we shall hereafter refer as Eloy, is engaged in the business of purchasing, producing, ginning and selling cotton. Its principal place of business is situate in Phoenix, Arizona. As cotton, at its plant, was ginned and baled, and the bales marked,

Eloy issued a gin-yard receipt for each bale. The cotton in question here was owned by Eloy before ginning and, therefore, the gin-yard receipts were issued by Eloy to Eloy.

Appellant, Eugene B. Smith & Company, Inc., hereinafter referred to as Smith, entered into a written contract with Eloy for the purchase of 1300 bales of cotton. The contract contained the following terms:

"Delivery In lots of not less than 100 B/C, as fast as ginned and cards obtained. * * *

"Insurance at sellers risk until payment completed.

"Reimbursement Sight draft, Ginyard receipts attached, also Smith/Doxey cards, Draw on Eugene B. Smith & Co., care Valley National Bank, Phoenix.

"This evidences the entire contract between the parties hereto, and all terms, provisions and conditions relating thereto, and supercedes all prior negotiations, agreements and conditions."

When lots of cotton of sufficient size were accumulated Eloy endorsed the ginyard receipts in blank, attached them to a bank draft and forwarded the receipts and draft to the bank care of Smith who, upon payment of the draft, was given possession of the receipts. Payment was made for the entire amount of cotton contracted for and gin-yard receipts delivered to Smith. Twelve hundred sixty bales of cotton were delivered and 39 of the remaining 40 bales were destroyed by fire on January 25, 1946 while stored in Eloy's gin-yard. Smith asserts that Eloy is liable for the loss of the 39 bales of cotton. Smith argues that the terms of the written contract providing "insurance at sellers risk until payment completed" should not be construed as a limitation on Eloy's liability, but that after payment an obligation contemplated by the gin-yard receipts became effective. Reliance is placed on a provision contained in the gin-yard receipts, reading as follows:

"Third: That said bail of cotton has been insured, while stored as aforesaid under this receipt against direct loss and/or damage by fire except as limited and provided in insurance policy covering same."

We think reference to gin-yard receipts in the contract was in connection with the technique of reimbursement adopted by the parties and in that connection only. Its use signifies a convenient means to enable the purchaser to acquire possession and control of the cotton. As the cotton was ginned Eloy issued receipts to itself and no contract or obligation was created at that point. The receipts contained a space for unpaid charges and following the line which read, "(1) Ginning, Bagging and Ties, Storage and Insurance for first twenty days $———," Eloy wrote "Pd.", indicating its realization that the forms were essentially being used for a purpose that was inappropriate since the depositor and receiver of the cotton were, at the time of issuance of the receipt, the same entity. The remainder of the forms dealing with insurance charges after the first twenty days was left blank as was the line which read: "Insurance paid to ———." The fact is that Eloy used a standard form of gin-yard receipt whose literal provisions were inapplicable to this transaction because of the express agreement as. to insurance. If the agreement Smith contends for was in effect, it is difficult to understand why the receipts were not couched in terms of charges to be levied and insurance made effective from the time payment was made for the cotton, in accordance with the terms of the contract of sale, rather than in terms of a 20-day period. Smith made no showing as to its practice in the use of the receipts, that is, whether in selling the cotton it purchased it would use the mechanism of endorsing the receipts over to its purchaser. On the contrary, the only suggestion in the record is that when the cotton purchased from Eloy was sold Smith sent it out under bills of lading, which negatives any intended use of the receipts for other than identification purposes.

Smith is extensively engaged in the buying and selling of cotton. Its principal place of business is located in Dallas, Texas. In Dallas, Texas, as shown by the testimony of T. S. McCorkle, an associate in the Smith business, there exists a custom that the seller insures to the time of payment and the buyer thereafter.[1]

1. Mr. McCorkle testified, in part, as follows:

"Q. And they are also in accordance with the Dallas Cotton Exchange contracts, aren't they? A. To my knowledge, there is no Dallas Cotton Exchange contract.

"Q. Well, there are certain rules of the Cotton Insurance Association? A. Well, the customs of the trade, customs of the trade, I would say, but no Dallas Cotton Exchange contract. This is the Texas Cotton Association.

"Q. I hand you the back part of Defendants' Exhibit 2, and ask you if the local rules of the Texas Cotton Association are not provided there? They are, are they not? A. That is correct.

"Q. And also the back of Defendants' Exhibit 1? A. Yes, sir; yes, sir.

"Q. And there is nothing on the face of that contract that is not in conformity with those Texas rules of 1941 and 1942, is there? A. As far as the Texas rules are concerned, I believe they undergo some changes annually, I don't know that there would be any substantial change, but, this is a 1941 and 1942 form. I notice these are dated in 1945. I just mention that, not as being of any importance.

"Q. In any event, that was a part of your contract at that time, being on the back of your confirmation order, Defendants' Exhibit 1? A. I presume that is the rules under which it is bought. To my knowledge, we don't buy Arizona cotton under Texas rules, but that is what we appeared to do in this case.

"Q. Well, I call your attention to the fact that there is nothing on the face, the front page of that exhibit, which conflicts with the rules on the back, is there? A. I don't know of anything, no, sir.

"Q. I call your attention to, insurance at seller's risk until payment completed, that is proper, isn't it? A. Let's see, 'at seller's risk until payment completed.' That is what it says.

"Q. And that is proper? A. That is the custom, yes, sir.

"Q. When the payment is completed, then it is no longer at seller's risk? A. That is correct."

Further, appears the following:

"Q. What is the custom in Dallas? A. I was just about to say, that that simply means that insurance covered by seller until paid for. We usually say here in Dallas, covered by seller until paid for, which means we pick up the insurance where he leaves off. When he gets his money, we insure it.

"Q. Well, when he gets his money, he is paid then? A. Yes, sir, when he gets his money, he is paid for the cotton.

"Q. If he is paid by draft drawn on you so far as you know, he has got his money? A. That is correct. We have paid for it, anyway."

Redirect Examination by Mr. Grissom:

"Q. You don't know what changes may have been wrought in the provisions of the receipt issued by the Eloy Gin Company? A. No sir, I am not familiar with that."

Recross-Examination by Mr. Johnson:

"Q. But, this particular contract, on its face, provides for following the rules of the Texas Cotton Association, which are printed on the back and referred to as being on the back, that is right, isn't it? A. That is what it appears. As I said, I never had considered that that cotton was bought under the rules of the Texas Cotton Association, it is merely a form, it is a contract between two dealers in cotton, and the rules applying, we very seldom consider those rules, except in cases—

"Mr. Johnson: Wait a minute. Have you completed your answer?

"A. Well, I don't know, I merely said that the face of the contract is the only thing that means anything to a merchant. The rules are there, but they have no part in that contract, they are simply put there for convenience. The contract is what is written on the face of it. Sometimes it is a little scrap of paper. It means the same thing. The terms of purchase; sometimes there is no contract at all, but there is a purchase, nevertheless, a written contract."

Redirect Examination by Mr. Grissom:

"Q. You mean the cotton merchants— A. We buy many thousands of bales where there is no written contract ever executed.

"Q. You may pick up one that the rules existed back years before? A. That is right, that is a convenient form to confirm the contract to purchase.

"Q. But it is the confirmation itself shown on the top side of the paper that you are interested in? A. That is right, yes, sir. It never occurred to me whether it was a '41 or '20."

■ Custom at Dallas, Texas, was admitted without objection; it does not of course control custom at Phoenix, Arizona. Mr. McCorkle's testimony is relevant only in assisting us in understanding Smith's purpose in limiting Eloy's liability to time of payment. If Smith relied on Eloy to furnish insurance after payment why is there no evidence in the record before us that it paid Eloy for insurance on the 1260 bales of cotton it took possession of, or explanation for failure to do so. Those were large transactions as compared to the 39 bales in question here. Had Smith's contention been the understanding of the parties it is reasonable to assume that Eloy would have billed Smith for insurance costs and Smith would have paid at the time of delivery. The contention urged by Smith is rather strange because, if true, it presents a picture of a careful business concern engaged in extensive commercial activities insisting upon a written contract, containing specific provisions for insurance protection up to a certain point and then failing to expressly provide for the remaining possible contingencies. Why did not Smith rely on the gin-receipts to protect it against loss before as well as subsequent to payment if it deemed the receipts served the purpose of an insurance contract? The answer is found in the fact that Smith carried other insurance which protected it after payment upon which it was paying premiums. Smith would not be interested in paying an additional premium which would be necessary in the event coverage was provided by Eloy. It is admitted that should the gin-yard receipt be held to have created an additional contract on the part of Eloy to insure then Smith would be indebted to Eloy for insurance charges. To avoid this double charge seems to us to be a logical explanation of Smith's motive in confining the contract requiring Eloy to furnish insurance to the time of payment. Such is the reason why Smith and Eloy executed a document which in express terms deals with the question of insurance and delineates the rights and liabilities of the contracting parties.

■ At the trial appellant offered to prove a custom in the trade under which purchasers of cotton would be billed by the gin for insurance charges on the cotton after the first 20 days. The Court rejected this offer. This proffered evidence was irrelevant because "'upon the construction of the whole contract, enough appears, either from express words or by necessary implication, to show that the parties did not intend that meaning, [that is, that indicated by the usage] to prevail.'" 3 Williston, Contracts, § 656 (Rev. Ed.1936). The express term of the contract dealing with insurance cut off the seller's obligation upon payment for the cotton.

Joined as a party defendant in the lower court, and as appellee on this appeal, was the Home Insurance Company, who Smith claimed had, in a policy issued to Eloy, insured the cotton. Smith has abandoned its appeal as to Home Insurance Company.

Judgment affirmed.

POPE, Circuit Judge (dissenting).

I think that when the endorsed gin-yard receipts were delivered by Eloy to Smith & Co., the relationship of the parties, which had theretofore been that of seller and buyer, became one of bailee and bailor. The paragraph in the gin-yard receipts relating to insurance on the cotton must be construed to be an undertaking and promise of Eloy that the cotton was and would be insured against loss by fire. I think that this express promise added to the obligations of Eloy stated or implied in the original purchase contract. If there was any consideration for this new or additional undertaking or promise, I think it was valid and enforceable. There seems to be no question by either party that if this clause in the gin-yard receipts created such an obligation, Eloy would be liable to Smith & Co. for failure to claim and collect the insurance. Farney v. Hauser, 109 Kan. 75, 198 P. 178. It is shown that it had the insurance, for the Home Insurance policy was introduced in evidence and it would

seem to cover this cotton.[1]  Home Ins. Co. v. Balt. Warehouse Co., 93 U.S. 527, 23 L. Ed. 868.

As for the question of whether the promise was supported by a consideration, had the appellant been permitted to prove, as it offered to do, that there was a custom in the trade that after the first twenty days the holder of such a receipt would upon presentation of a bill for the same, pay the cost of the insurance on the cotton, the record would have contained evidence from which a consideration might be found. I am therefore of the opinion that it was error to reject the offered evidence, and I would reverse and remand with directions to grant a new trial.

Apparently the majority view here is that the promise with respect to the insurance contained in the gin-yard receipts should be disregarded because it is hard to understand why Smith & Co. would pay for its own insurance upon cotton purchased if it intended to rely upon the gin-yard receipts.

I think that view overlooks the special limiting provisions in the policy of the National Fire Insurance Co. which was issued to Smith & Co.  That policy provided: " * * * this insurance does not cover the following: * * * Cotton for which any carrier or other bailee is liable, or cotton under bills of lading or storage receipts that give the carrier, warehouseman or other bailee the benefit of any insurance thereon, or cotton on which any carrier or other bailee has insurance which would attach if his policy had not been issued, or insurance which would, under any circumstances, inure to the benefit of the Assured hereunder." [2]

The policy also provided that after presentation of proofs of loss with respect to cotton, of the kind mentioned in the language quoted, the Insurance Company would "advance as a loan to the Assured the amount of such loss or damage, repayable only to the extent of any recovery from such carrier or bailee."  After the loss here in question, the National Fire Insurance Company did just that, and took Smith & Co.'s receipt for the amount paid, which recited that it was a loan.  I know of no reason why this provision of the policy should not be given effect or why the advance of the money to Smith & Co. should not be treated as a loan.  See Luckenbach v. McCahan, 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170; Clark Cotton Co. v. Jones, 31 Ga.App. 587, 121 S.E. 519.

It is apparent that the National Fire Insurance policy procured by Smith & Co. gave only limited coverage.  It is a fair inference that such a policy is obtainable at a lower premium.  I think therefore that it was reasonable for Smith & Co. to rely not only upon its own policy but also on the insurance described in the gin-yard receipts.[3]

1.  Apparently Eloy permitted the insurance adjuster to talk it out of claiming and collecting the insurance.  Whether the conduct of an insurance agent would constitute such a waiver as would permit Eloy even yet to sue the Home Insurance Company is, of course, not before us, nor is the question of whether Smith & Co. might itself have recovered from the insurance company in view of the fact that the policy covered merchandise "held in trust" or "left for storage".  See annotation 61 A.L.R. 720; Century Ins. Co. v. First Nat. Bank, 5 Cir., 102 F.2d 726.  The conclusion of law (No. 3) that Eloy could not recover on its cross-claim against Home, was predicated on Eloy's prayer for judgment against Home, only if Smith & Co. recovered against Eloy, and upon pleadings which made no claim of waiver.  Had the judgment been reversed, as I think it should be, the entire case should have been remanded, and the question of Home Insurance Co.'s liability reopened.

2.  In printing the record, the printer has apparently detached portions of this policy and attached it to the Home Insurance policy, which makes the printed record confusing.  Inspection of the original exhibits shows what happened.

3.  I am at a loss to understand the reason for the lengthy extract from testimony concerning a custom in Texas.  Admittedly that "does not * * * control custom at Phoenix."  Its only purpose could be to disclose Smith & Co.'s unilateral understanding of the original purchase contract, which clearly was plain and unambiguous.

I can perceive no reason why, if appellant is allowed to prove consideration therefor, the plainly worded recitals of the gin-yard receipts relating to insurance should not be enforced against Eloy.

On Petition for Rehearing

The petition for rehearing is denied.

POPE, Circuit Judge.

I adhere to the views of my dissenting opinion, but agree that a rehearing would serve no useful purpose.