**EXPORT LEAF TOBACCO COMPANY,**
Appellant,

v.

**The AMERICAN INSURANCE COMPANY OF NEWARK, NEW JERSEY,**
Appellee.

**The AMERICAN INSURANCE COMPANY OF NEWARK, NEW JERSEY,**
Third-Party Defendant, Appellant,

v.

**EXPORT LEAF TOBACCO COMPANY,**
Plaintiff, and Park Bernard and W. W. Bernard, Partners trading as Burley Bee Warehouse, Defendants, Appellees.

**EXPORT LEAF TOBACCO COMPANY,**
Plaintiff, Appellant,

v.

**Park BERNARD and W. W. Bernard,**
Partners trading as Burley Bee Warehouse, Defendants, Appellees.

Nos. 7460, 7664.

United States Court of Appeals
Fourth Circuit.

Argued June 18, 1958.

Decided Oct. 14, 1958.

Wm. A. Stuart, Abingdon, Va. (Penn, Stuart & Phillips, Abingdon, Va., on brief), for Export Leaf Tobacco Co.

Robert B. Davis, Bristol, Va., and Stuart B. Campbell, Wytheville, Va. (Campbell & Campbell, and Stuart B. Campbell, Jr., Wytheville, Va., on brief), for American Ins. Co. of Newark, New Jersey.

Wm. H. Woodward, Bristol, Va. (Jones, Woodward, Miles & Greiner, Bristol, Va., on brief), for Park Bernard and W. W. Bernard, Partners trading as Burley Bee Warehouse.

Before SOBELOFF, Chief Judge, SOPER, Circuit Judge, and PAUL, District Judge.

SOBELOFF, Chief Judge.

In these consolidated appeals a dealer who had purchased a quantity of tobacco at an auction warehouse in Abingdon, Virginia, seeks to recover for loss sustained in a fire which occurred at the warehouse before the tobacco was removed. We are called upon to decide whether the loss falls upon the warehouseman or its insurer or on the plaintiff's insurers.

The tobacco purchaser was Export Leaf Tobacco Company ("Export Leaf"), a Delaware corporation. The Burley Bee Warehouse ("Burley Bee") was owned and operated by Park Bernard and W. W. Bernard, now deceased. The warehouse, with all its contents, was destroyed by fire on the night of December 12, 1955. The American Insurance Company of Newark, New Jersey ("American") had issued to Burley Bee, as the named insured, a standard fire policy entitled "Form 61V-Virginia," "Tobacco in Sales Warehouse (Auction Form)." This policy was in effect on the date of the fire and provided Burley Bee with coverage

> " * * * on leaf, loose, scrap and stem tobacco, the property of others while in the custody of the insured *for auction* * * * while on the premises of the above described tobacco sales warehouse or while located within 100 feet thereof whether in the open or in vehicles." (Emphasis supplied.)

Three days before the fire, on Friday, December 9, 1955, and on the next sale day, Monday, December 12, 1955, the very day of the fire, Export Leaf had made its auction purchases, aggregating 45,000 pounds of tobacco. When the fire occurred, a small portion of Export Leaf's tobacco had been removed. The remainder, placed in burlap sheets, had been taken from the sales area and put in another location in the warehouse preparatory to shipment. The fire was of

unknown origin and without fault of Burley Bee.

### The Two Suits

Suit (No. 7460) was instituted in the United States District Court for the Western District of Virginia against American, on the theory that as the warehouseman's insurer, it was solely liable to the purchaser. After trial, the District Court took the view that American's policy issued to the warehouseman under Form 61V did not cover the tobacco in question, and dismissed the suit, 148 F.Supp. 303.

Export Leaf then filed a new suit (No. 7664), this time against Burley Bee, the warehouseman, on the theory that it had made itself liable by failing to effect the insurance coverage required by Section 61–132 of the 1950 Code of Virginia, which is set out in the margin.[1] Burley Bee impleaded American as third-party defendant. At this trial the District Judge, reversing the position he had taken in No. 7460, held, "in light of the fuller state of facts developed in this case," (7664) that Form 61V in American's policy to Burley Bee, construed in connection with the coverage requirement of Code Section 61–132, did insure Export Leaf's tobacco. Accordingly, he exonerated the warehouseman and entered judgment against American in favor of Export Leaf, 161 F.Supp. 97.

In each case the defeated party appealed, and in this court the appeals were heard together.

### Applicability of Section 61–132

■ A chief contention of the warehouseman, Burley Bee, and American, its insurer, is that Section 61–132, which imposes certain obligations on warehousemen to provide fire insurance, or themselves become liable, does not apply to tobacco auction warehouses, but only to storage warehouses. It is pointed out that the first sentence of this section requires the sampler[2] to pay the warehouseman all money owing to the warehouseman but received by the sampler. The second sentence contains the requirement for insurance. From this it is argued that the section cannot refer to auction warehouses, for there have been no samplers in auction warehouses for over twenty years. However, this argument loses force when it is noted that samplers have been non-existent for many years in *any* tobacco warehouses, auction or storage.

The warehouseman's argument continues that, as the only money received by samplers which is owing to warehousemen is for storage fees, the first sentence can apply to storage warehouses only; and since the second sentence is linked to the first by the conjunction "and," its application is also limited to storage warehouses.

It is to be observed, however, that Chapter 4 of Title 61 of the Code is entitled "Tobacco Warehouses and Regulations in General," the first section of which declares that "Tobacco warehouses * * * shall * * * at all times, Sunday excepted, be open for receiving, storing, *selling* and delivering tobacco. * * * *" (Emphasis supplied.) Thus, the statutory definition of tobacco warehouses contemplates not only the function of storing but also that of selling. More-

---

1. "§ 61–132. When samplers to settle with proprietors; insurance.—The samplers of each warehouse shall account for and pay to the proprietors thereof, on the tenth day of April, the tenth day of July, the tenth day of October, and the tenth day of January, in each year, all money received, or which ought to be received, by them, to the use of the proprietors. And the proprietors of every such warehouse shall keep, free of charge to the planter and owner of tobacco, an open policy of insurance upon their respective warehouses, sufficient to cover every loss by fire or water which any person having tobacco stored therein may sustain; and for a failure so to do, they shall be liable to the owners thereof for any damage or loss they may sustain by reason of any partial or total destruction of the tobacco by fire or water."

2. Samplers were state officials who graded and certified the tobacco brought into the warehouses for sale.

over, the parties concede that among planters, the prevailing method of marketing tobacco is in auction warehouses. Planters rarely, if ever, deal with storage warehouses. If the statute does not apply to auction warehouses, then not only purchasers would be excluded from the insurance benefit, but also planters, whose primary business is with auction warehouses. Unless the language of the statute clearly evidences such a purpose, it is not to be supposed that the Virginia legislature meant to except from the purview of the statute the type of warehouse which has become so predominant in the state's tobacco industry.

■ Again it is urged on this point that the phrase "stored therein" in Section 61–132 should be read in light of the two preceding sections in Chapter 4 which establish fees for tobacco *stored* in warehouses. There is no compelling reason, however, so to limit the construction, since numerous sections in the same chapter relate to auction warehouses. We have seen that the first section of Chapter 4 refers to the "selling" function of warehouses. Similarly, Section 61–108 provides for proper billing of *auction* fees; and Sections 61–109, 61–110, and 61–111, providing for accounting and maintaining records and making reports of *sales,* are clearly applicable to auction warehouses. "Stored" does not necessarily imply long duration, but can equally describe tobacco remaining in an auction warehouse awaiting removal by the purchaser.[3]

■ It is further insisted by American that Section 61–132 is for the protection of planters only and not purchasers. As we have seen, this section requires warehouse proprietors to maintain insurance free of charge to the "planter and owner" to cover every fire or water loss which "any person" having tobacco stored therein may sustain. For failure to do so, this section prescribes that warehousemen shall be liable "to the owners thereof" for such loss. American's reading of the statute is that "any person" is limited to a single class, "planter and owner," and that the phrase means only an owner who is likewise a planter.

We see no reason for limiting the protection to those who are simultaneously planters and owners. The legislative history of Section 61–132 strongly suggests that planters and owners are referred to severally and not as a single class. The 1873 Code of Virginia, Title 26, Chapter 85, Section 52, provided that " * * * the proprietors of every such warehouse shall keep, free of charge to the *planter,* an open policy of insurance upon their respective warehouses, sufficient to cover every loss by fire, which any *planter* having tobacco stored therein may sustain." (Emphasis supplied.) This contrasts with the section as amended to its present form in 1877, and codified in 1887. Whereas the 1873 statute provided for insurance without charge to the "planter," the present statute provides such insurance to the "planter and owner"; and, whereas in the older enactment the insurance was for losses sustained by "any planter," the newer law speaks of losses which "any person" may sustain. If the legislative purpose in 1877 was to restrict the law's application to "planters," no apparent reason exists for the introduction of the additional words "and owner," or the words "any person." The interpretation proposed by American would leave us without explanation as to why the broader language—which reasonably implies coverage to owners who are not

3. Another and somewhat similar distinction might be thought to exist between public and private tobacco warehouses, with the suggestion that Sec. 61–132 applies to the former and not the latter. No such distinction was, however, proposed to us in the argument of counsel, probably because the Supreme Court of Appeals of Virginia, in Tobacco Growers' Cooperative Association v. Danville Warehouse Co., Inc., 1926, 144 Va. 456, 132 S.E. 482, 483, long ago held that the term "public-tobacco warehouse" is used in Chapter 110, Acts of 1923, "according to its ordinary meaning" and not in the sense that it be a warehouse established by law pursuant to Sec. 1348 of the 1919 Code of Virginia (now Sec. 61–95 of the 1950 Code of Virginia).

planters—was substituted for the unambiguous restrictive language of the 1873 statute.

We conclude, therefore, that "any person" should be given its full import without restricting it to planters, but should be held to include owners, whether planters or purchasers at auction sales, whose tobacco has not yet been removed from the warehouse. They are owners "having tobacco stored therein" and, therefore, within the benefits of Section 61–132.

### Scope of Coverage Under Form 61V

In our next inquiry we turn from the statute itself to Form 61V, embodied in the policy issued by American to Burley Bee. Was it, in any event, broad enough to provide coverage for the destroyed tobacco? We shall deal first with the proper construction of the policy provision in light of the statute, and then with the meaning of the words "for auction" in the policy form, independent of the statute.

■ 1. It should be noted that under Virginia law only officially approved insurance forms may be issued. 1950 Code of Virginia, Secs. 38.1–226, 38.1–263. There is impressive evidence indicating that Form 61V was promulgated in reference to the statutory liability imposed by Section 61–132. Form 61V was submitted by the Insurance Bureau (of which American is a member) to the State Corporation Commission, which approved it. The Bureau's letter,[4] submitting the "Tobacco Sales Warehouse Auction Form" (Our emphasis), read in part: "In order to provide a special form to cover the warehouseman's liability, we are attaching herewith * * * copy of form 61–V, which we feel will take care of the conditions." (Our emphasis.) Since Section 61–132 is the only Virginia statute requiring tobacco auction sales warehouses to maintain fire insurance, the auction warehouseman's liability mentioned in the above letter could relate only to that statute. Form 61V is the only insurance form in Virginia provid-

4. "Virginia Insurance Rating Bureau, American National Bank Building, Richmond, Virginia

"Post Office Box 1198    September 4th, 1935
Phone: Dial 2–8361

"Judge Thos. W. Ozlin    *Tobacco Sales Warehouse Auction Form, Reporting Cover, Amendment Virginia Hand Book*
State Corporation Commission
State Office Building
Richmond    Virgina

"My dear Judge Ozlin:

"For a number of years tobacco in sales warehouses in Virginia and in the States south of us, has been written under the Inland Marine form on the assumption that the warehouseman assumes certain liability that would make the coverage subject to the Inland Marine rules.

"It has now been ruled by the Committee on Interpretation that the warehouseman's liability, assumed or otherwise, does not come under the Inland Marine form of cover.

"In order to provide a special form to cover the warehouseman's liability, we are attaching herewith copy of amendment to the Hand Book, which provides for this form of cover and also copy of form 61–V which we feel will take care of the conditions. This amendment is in line with the rules in the States south of us, with minor changes.

"Trusting that this will be approved by you at an early date, inasmuch as the warehouseman's season will open at an early date, we beg to remain, with highest regards,

"Very truly yours,
(s) E. W. Spencer,
Manager"

ing coverage for loose leaf tobacco auction sales warehouses and its issuance is mandatory. (A different form is provided for tobacco storage warehouses.) It is well settled that "[c]ontracts of insurance are presumed to have been made with reference to the law of the land, and such laws enter into and form a part of the contract, as much as if actually incorporated therein. * * *." 1 Couch, Cyclopedia of Insurance Law, 1929 Ed., Sec. 150 at page 297.

■■ 2. Apart from the statute, the language in Form 61V is sufficiently broad in itself to cover the tobacco destroyed by the fire; and of course an insurer is bound by the terms of its policy even if it is more inclusive than the law's command, provided its terms are not proscribed by law. The form insures tobacco in the warehouse "for auction." An auction is not necessarily deemed terminated for all purposes with the auctioneer's crying and knocking down the merchandise. Auctioning is a process that includes certain necessary steps before and after the actual sale.

In tobacco marketing practice, growers may bring their product to the warehouse as long as two weeks before the sale. There the tobacco is suitably arranged, and when it has been sold to the highest bidder, a coupon designating the purchaser is placed on each pile and the tobacco is then tied together in a burlap sheet to await shipment. Each sheet is marked to make the tobacco readily identifiable. Sometimes it is not sheeted for days after the fall of the hammer. Many things may arise in normal course to delay removal. Occasionally the farmer may reject the price bid and get his tobacco back; or the buyer may reject the sale if he subsequently discovers the tobacco to be wet or mixed. Customarily the tobacco is paid for by the purchaser, not at the fall of the hammer, but rather when he moves the tobacco from the warehouse, although the warehouseman

advances the sales price to the grower. Purchasers who have packing houses (prizories) in the area of the auction warehouse usually ship their tobacco at once directly from the sale floor. Other buyers, however, may leave the tobacco in the warehouse pending arrangements for its removal. Not uncommonly tobacco remains on the floor up to ten days or even longer after sale, depending upon the availability of trucks, box cars and shippers. Export Leaf, having no prizory, had not effected removal of its tobacco before the fire.

It is not disputed that Form 61V provides coverage at least until the sale. Viewing the auction process as an entirety, it would be incongruous to hold that Form 61V provides coverage for one phase of the process, i. e., until the moment of sale, and not thereafter for a reasonable time to allow removal.

■■ We hold that Form 61V, as well as the statute, covers tobacco until its removal within a reasonable time from the auction warehouse. Even if the point were less certain, we would arrive at the same result by applying the rule in force in Virginia, as in most states, which calls for liberal construction of insurance policies in favor of the insured. Ayres v. Harleysville Mut. Casualty Co., 1939, 172 Va. 383, 2 S.E.2d 303, 305, 306.

### Excess Insurance Clause

Export Leaf, however, was independently insured under a floater policy by a group of nine insurance companies—American and eight others which will be referred to as the "Eight Carriers." [5] The joint floater policy covered all of Export Leaf's tobacco "wherever situated." Thus, American was one of the joint insurers of the owner of the destroyed tobacco, and was at the same time the sole insurer of the warehouseman.

After the fire, Export Leaf's insurers (including American) advanced to Export Leaf the aggregate of $26,105.84,

5. The Eight Carriers: Aetna Insurance Company, American Equitable Assurance Company, Centennial Insurance Company, Milwaukee Insurance Company, Han-

over Fire Insurance Company, Travelers Fire Insurance Company, The Home Insurance Company, and Standard Marine Insurance Company.

the value of the tobacco, each company contributing its pro rata share. Of this sum, American supplied $2,610.58; the Eight Carriers $23,495.26, the amount in suit. These advances were made upon a loan agreement executed by Export Leaf. The provisions here pertinent are as follows:

"As a loan, without interest, repayable only in the event and to the extent of any net recovery the undersigned may make from any person, persons, corporation or corporations, or other parties, causing or liable for the loss or damage to the property described below, or from any insurance effected on such property. * * *

"The undersigned hereby agrees to promptly present claim, and, if necessary, to commence, enter into and prosecute suit against such person or persons, corporation or corporations, or other parties, through whose negligence or other fault the aforesaid loss was caused, or who may otherwise be responsible therefor, with all due diligence, in his, its, or their own name. * * * *"

Pursuant to its duty under the loan receipt, Export Leaf prosecuted the two successive suits in the District Court for the benefit of the Eight Carriers. The contest there and here is essentially one between American and these companies.

In the second District Court case (No. 7664), American raised an additional defense based on the "Excess Insurance Clause" in its policy to Burley Bee, which provided that:

"This policy does not attach to or become insurance against any peril upon property herein described, which at the time of any loss is insured * * * until the liability of such * * * insurance has been exhausted, and then shall cover only such loss as may exceed the amount due from such * * * insurance * * *."

American urges that the effect of this Excess Clause was to relieve it of its obligation to the extent that Export Leaf's floater policy covered the loss. The claimed result should follow if "such * * * insurance," referred to in the Excess Clause, means insurance taken out by *anyone* on the destroyed tobacco. The District Judge, however, reached the conclusion that the Excess Clause referred only to other insurance procured by the *named insured*, Burley Bee, and not to insurance taken out by Export Leaf for its own protection. His decision accords with the prevailing weight of authority.

In Automobile Ins. Co. of Hartford, Conn. v. Springfield Dyeing Co., 3 Cir., 1940, 109 F.2d 533, Springfield, a silk dyer, obtained insurance for all customers' goods in his possession, but this was not to apply to goods covered by "other insurance." Goods on which a customer also had taken out insurance were stolen from the dyer's establishment. The Court held that "other insurance" embraced only that taken out by the dyer Springfield, the named insured, and that therefore the customer's insurance did not affect Springfield's policy. The same construction was given a similar clause in American Alliance Ins. Co. v. Brady Transfer & Storage Co., 8 Cir., 1939, 101 F.2d 144, 147.

Cases have come to our attention which hold that an excess clause applied to insurance taken out by others than the named insured, but these are cases in which the excess clause *specifically* referred to such other classes. See St. Paul Fire & Marine Ins. Co. v. Garza County Warehouse & Marketing Ass'n, 5 Cir., 1938, 93 F.2d 590, 591, in which it was provided that the insurance did "not cover any cotton on which the *owner* has other insurance"; Automobile Ins. Co. of Hartford, Conn. v. Springfield Dyeing Co., 3 Cir., 1940, 109 F.2d 533, 534, where one of the policies expressly denied the warehouseman coverage "to the extent of any other insurance whether prior or subsequent hereto in date, and *by whomsoever effected,* directly or indirectly, covering the same property * * *"; and Marshall v. World Fire & Marine Ins. Co. of New York, 9 Cir., 1945, 149

F.2d 902, 903, where the excess clause excluded coverage "when there is any other insurance * * * whether such insurance be in the name of the Assured or of *any third party*." (Emphases supplied.) Compare Judge Haynsworth's discussion of the subject of excess insurance relating to leased motor vehicles in American Surety Co. of New York v. Canal Insurance Co., 4 Cir., 1958, 258 F.2d 934, 936. There the excess clause was in terms applicable to "any other valid and collectible insurance available to the Insured, either as an Insured under a policy applicable with respect to the automobile or otherwise."

■ It requires no argument to demonstrate that these provisions differ radically from the one before us. American's defense based on the Excess Insurance Clause must fail.

### The Loan Receipt As A Bar To Suit

■ The further defense is interposed that the transfer of funds by the Eight Carriers and American to Export Leaf was in reality a payment, rather than a loan, and that this precludes reimbursement from American or Burley Bee. This Court has held that where goods insured by an owner have been destroyed while in the possession of a bailee, and the bailee is liable for the loss, the owner can enforce the bailee's liability for the benefit of the owner's insurer who advanced money to the owner pursuant to a loan receipt similar to the one in the instant case. Sorenson v. Boston Ins. Co., 4 Cir., 1927, 20 F.2d 640, 641, 642. In that case the late Judge Parker cited and followed Luckenbach v. W. J. McCahan Sugar Refining Co., 1918, 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170, which sanctioned the loan receipt device and permitted suit by the owner of destroyed goods, for the benefit of the insurer, against a carrier who was liable for the loss. In accord: Automobile Ins. Co. of Hartford, Conn. v. Springfield Dyeing Co., 3 Cir., 1940, 109 F.2d 533.

Defendants rely on Harwood-Yancey Co. v. Lawrenceburg Warehouse Co.,

1933, 167 Tenn. 14, 65 S.W.2d 192, 195, which dismissed a suit brought against a warehouseman by an owner whose goods were destroyed while in the warehouse. The owner himself carried insurance on the destroyed goods and had been advanced the amount of his loss by the insurer under a loan receipt. The Supreme Court of Tennessee held that the owner could not recover for the benefit of his insurer, the value of the goods, because the owner had "sustained no damage except the cost of the [insurance] premium."

■ This reasoning we find unacceptable, not only because contrary to the authorities, but also because the owner's loss really was the value of the goods; the fact that his net loss may be later reduced by insurance has no bearing on the question as to where the loss should fall. The wording of the loan receipt must be given its full import, i. e., to allow Export Leaf to "prosecute suit against such * * * parties * * who may otherwise be responsible" for the loss. "Whether the transfer of money or other thing shall operate as a payment, is ordinarily a matter which is determined by the intention of the parties to the transaction." Luckenbach v. W. J. McCahan Sugar Refining Co., 1918, 248 U.S. 139, at page 149, 39 S.Ct. 53, at page 55, 63 L.Ed. 170; 2 Barron and Holtzoff, Federal Practice and Procedure 13, Sec. 482. Indeed, American is placed in an anomalous position to object to the loan receipt device to which it was a party.

If Burley Bee had not effected the insurance required by Section 61–132, Export Leaf could, under the statute, have recovered from Burley Bee for the benefit of the insurers of the floater policy. Sorenson v. Boston Ins. Co., 4 Cir., 1927, 20 F.2d 640, 641, 642. The insurer of either Export Leaf or of Burley Bee must bear the loss. Since Export Leaf's insurer would not have had to bear the ultimate loss if Burley Bee had not effected insurance, it should not have to bear the ultimate loss because Burley Bee *did* effect insurance in obedience to the law.

It is argued that if recovery is allowed, the Eight Carriers will receive an unexpected windfall, for they will not have to pay a loss against which they contracted to insure. However, the sword cuts both ways. To deny recovery here is to relieve American of its obligation under Form 61V. There is no indication in the record that American contracted with Burley Bee in reliance on any auction purchaser carrying its own insurance. In fact, the converse is indicated, since Burley Bee was under a statutory mandate to effect insurance for its customers. On the other hand, there is evidence that Export Leaf's insurers anticipated other insurance, for the floater policy provided that it was "not to enure directly or indirectly to the benefit of any carrier * * * [or] any other bailee."

### Procedural Points

Finally, we notice certain procedural points raised by American. It contends that the District Court in the second case (No. 7664) improperly entered judgment against American in favor of Export Leaf, for the latter did not amend its complaint so as to "assert any claim against the third-party defendant," American; that judgment cannot be entered without a direct pleading; and that any amendment by Export Leaf would have been to no avail, for American could have raised the defense of res judicata because of the first suit, which terminated in favor of American.

American insists that it is entitled to hold its victory in No. 7460, and that the judgment in that case should not, on this appeal, be affected by any facts adduced for the first time in the record of the second case. While it is true that certain testimony not offered in the first case was introduced in the second, and that the District Judge did say that this helped to clarify the issue for him, we think the ruling made on the question of law did not depend upon this testimony, and that American was, in any event, not damaged thereby, since it relates largely to matters of which the Court could properly take judicial notice even in the absence of testimony.

It may be, as claimed by American, that in the second case, the District Judge having found Burley Bee not liable under the pleadings, no judgment should have been extended in that case against American as third-party defendant. We need not pass upon this nor upon the interesting procedural problems raised in that connection under Rules 8(a) and 14(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.; nor need we consider Export Leaf's cross-appeal against Burley Bee. As we view the matter, Export Leaf is entitled to recover against American in No. 7460, and as this gives it all that it seeks or is entitled to have, these additional issues in No. 7664 are not required to be decided.

Accordingly, judgment in No. 7460 is reversed and the case remanded for judgment in favor of the plaintiff against the defendant American; and the judgment in No. 7664 is vacated and the case dismissed.

Judgment in No. 7460 reversed and remanded for proceedings in accordance with this opinion; judgment in No. 7664 vacated and case dismissed.