**GENERAL CIGAR CO., Inc., to its own use and to the use of Home Insurance Co., N. Y., and General Cover Underwriters Association, Plaintiffs,**

v.

**LANCASTER LEAF TOBACCO CO.,**

and

**Farmer's Warehouse, Inc., Defendants.**

**GENERAL CIGAR CO., Inc., to its own use and to the use of Home Insurance Co., N. Y., and General Cover Underwriters Association, Plaintiffs,**

v.

**James SCHULTZ and John V. Thompson, Defendants.**

**Civ. Nos. 20229, 20489.**

United States District Court, D. Maryland.

March 3, 1971.

 

 

 

Donald A. Krach, Barrett W. Freedlander and Niles, Barton & Wilmer, Baltimore, Md., for plaintiffs.

Herbert F. Murray, Robert E. Powell and Michael A. Pretl, Baltimore, Md., for defendant Lancaster Leaf Tobacco Co.

W. Hamilton Whiteford and William B. Whiteford, Baltimore, Md., and Rudolph A. Carrico, LaPlata, Md., for defendants Farmer's Warehouse, Inc., James Schultz, and John V. Thompson.

HARVEY, District Judge:

On March 27, 1966, a fire occurred in a tobacco warehouse in Hughesville, Maryland, belonging to Farmer's Warehouse, Inc. ("Farmer's Warehouse"), completely destroying 7526 bales of tobacco owned by General Cigar Co., Inc. ("General Cigar"). The tobacco was insured under two separate policies issued by Home Insurance Company and General Cover Underwriters Association, who paid General Cigar a total of $429,086 for its loss and received "subrogation receipts" in return. As subrogees, the two insurance companies now seek reimbursement in these two civil actions from Lancaster Leaf Tobacco Company ("Lancaster Leaf"), which arranged for the purchashing and storage of the tobacco, from Farmer's Warehouse and from the latter's owners and operators, James Schultz and John V. Thompson.[1] Jurisdiction exists because of diversity of citizenship and the amount of damages claimed.

Having paid General Cigar for its loss, the plaintiff insurance companies, as subrogees, have alleged in two separate counts of the amended complaints negligence and breach of contract on the part of all the defendants. In addition, the amended complaints contain a third count asserted against only Farmer's Warehouse and the two individual defendants. This count is based upon a theory of absolute liability because of the alleged failure of such defendants to comply with § 51(a) of Article 48, Annotated Code of Maryland (1965 Repl.Vol.), a Maryland statute which requires the proprietor of every privately-owned tobacco warehouse to insure the contents of his warehouse against fire, subject to certain exceptions. Farmer's Warehouse, in

1. By Order of Court, these two cases have been consolidated for all purposes under Rule 42 (a), F.R.Civ.P.

turn, has filed a cross-claim against Lancaster Leaf, alleging breach of contract by the latter in failing to obtain insurance and negligence in storing and stacking the tobacco.

Presently before the Court are (1) plaintiffs' motions for partial summary judgment against defendants Farmer's Warehouse, Shultz, and Thompson solely on the issue of liability under the third count; (2) defendants' motions to dismiss the third count; and (3) defendants' motions for judgment on the pleadings as to all counts. In support of their respective motions, the parties have relied upon the extensive discovery undertaken to date in these cases, including numerous depositions that have been filed. In view of the depositions and exhibits which have been submitted in support of the motions, this Court will, pursuant to Rules 12(b) and (c) of the Federal Rules of Civil Procedure, consider all the pending motions to be for summary judgment or partial summary judgment.

The essential facts are not in dispute. Lancaster Leaf, a subsidiary of Universal Leaf Tobacco Company, has long been in the business of buying tobacco both on order for various cigarette and cigar manufacturers and also on its own behalf for subsequent resale to such manufacturers. Since about 1960, it has bought tobacco for the account of General Cigar, a New York manufacturer, receiving a commission on the purchase itself and charging additional sums for baling, storage, and processing. From April through July of 1964, Lancaster Leaf bought for General Cigar's account about 4 million pounds of 1963 Maryland leaf tobacco from various suppliers, each of which packed the purchased tobacco into bales. Since Lancaster Leaf had agreed to undertake processing and storing for General Cigar, it began moving this tobacco into its storage warehouses in Lancaster, Pennsylvania, as it was purchased and baled.

Finding that it had space only for the first 2.7 million pounds, Lancaster Leaf requested one of its suppliers, Free State Tobacco Co., Inc., ("Free State"), to arrange for continued storage of the remainder of the tobacco, as it was bought, in facilities maintained by Farmer's Warehouse.[2] Although Farmer's Warehouse was not generally in the business of storing tobacco for prolonged periods of time, it agreed with Free State to let Lancaster Leaf use a small auction warehouse building for storage until around the middle of April, 1965, when that facility would be needed for the sale of the 1964 crop. On May 27, 1964, Free State wrote Farmer's Warehouse confirming this temporary storage agreement, and promising that the tobacco "will be insured by Lancaster Leaf Tobacco Co.," on behalf of whom Free State represented it was acting as agent. A copy of such letter was sent to Lancaster Leaf. Subsequently, on October 20, 1964, Lancaster Leaf wrote to General Cigar, confirming the former's purchase of tobacco in the latter's behalf and stating:

> "The tobacco in this purhase will be insured by us, or our suppliers, from the time it is purchased until it is packed at a valuation of 30 cents per pound with no premium cost to you. "We are moving the tobacco as it is packed into our storages *at which time you will cover with insurance*." (Emphasis added)

General Cigar did in fact already carry two "manufacturer output policies" issued by Home Insurance Company and General Cover Underwriters Association, which covered all property purchased for its ultimate account or use by its "agent or others or stored in [its] name or in the name of others." It is undisputed that the tobacco in question, though lo-

---

2. Free State is not a party to these proceedings.

cated in the warehouse owned by Farmer's Warehouse, was covered by these policies.[3]

In the spring of 1965 (which was the beginning of the 1964 tobacco auction season), Lancaster Leaf was still unable to provide storage space in its own facilities. It therefore moved General Cigar's tobacco into an unused quonset hut owned by Farmer's Warehouse with the understanding that the agreement of May 27, 1964 would remain in effect and the tobacco would be removed as soon as possible. The entire 7526 bales remained in storage there for slightly more than a year until, on March 27, 1966, the aforementioned fire broke out, destroying the quonset hut and its contents.

### Plaintiffs' Rights as Subrogees

■ Suing here as subrogees, the insurance company plaintiffs possess only those rights against a third party which their insured might have, and any action taken by such insured which would bar its recovery against a third party would also be binding on the insurers. This rule was clearly recognized by the Maryland Court of Appeals in Poe v. Philadelphia Casualty Co., 118 Md. 347, 84 A. 476 (1912), at page 353, 84 A. at page 478:

"In 27 Amer. & Eng. Enc. of Law 212, the author of that article, says: 'The surety is entitled to all the rights of the *person* to whose place he is subrogated, *but to no greater rights*.' And again, on page 206, he says: 'The rights acquired by a party entitled to subrogation cannot be extended beyond the rights of the party under whom subrogation is claimed. Subrogation contemplates some original privilege on the part of him to whose place substitution is claimed; and where no such privilege exists, or where it has been waived by the creditor, there is nothing on which the right can be based. While a surety who pays the

debt of his principal is subrogated to the rights of the holder of the claim, he takes such rights subject to all disqualifications and limitations which attached to them in the hands of his predecessor.'

"It is clear from these accepted definitions that the only element of substitution in subrogation is of one *person* in the place of another; and that the person so substituted can exercise no right not possessed by his predecessor, and can only exercise such right under the same conditions and limitations as were binding on his predecessor." (Emphasis in original)

*See also* Western Casualty & Surety Co. v. Brooks, 362 F.2d 486, 491 (4th Cir. 1966); Security Ins. Co. of New Haven-The Connecticut Indemnity Co. v. Mangan, 250 Md. 241, 245–246, 242 A.2d 482 (1968); Maryland Title & Escrow Corp. v. Kosisky, 245 Md. 13, 225 A.2d 47 (1966); 11 Appleman, Insurance Law & Practice § 6505 (1944); 13 Maryland Law Encyclopedia, Insurance § 274 (1961), at 60.

In analyzing the rights and obligations of the parties here, this Court must then in the first instance consider them insofar as General Cigar, the owner of the destroyed tobacco, is concerned. Any conditions or limitations to General Cigar's rights against the defendants, resulting from agreements to which General Cigar was a party or otherwise, must necessarily attach to the claims being asserted here by the insurance company plaintiffs.

### Applicability of the Maryland Statute

Under Count 3 of the amended complaints, the plaintiffs assert a right to recover from Farmer's Warehouse and its owners and operators because of § 51(a) of Article 48, Annotated Code of Maryland (1965 Repl.Vol.). That statute provides as follows:

" § 51. Insurance

---

3. Indeed, the insurance company plaintiffs later paid the amount of the loss to

General Cigar pursuant to the provisions of these policies.

(a) *Duty to provide; charge for expense.*—The proprietor or manager of every warehouse except the State tobacco warehouses holding tobacco for sale or storage shall keep an open policy of insurance upon the contents of his warehouse sufficient to cover every loss by fire, and coverage for loss by water if same may be obtained at reasonable cost, which any person having tobacco stored therein may sustain, and for failure so to do, he shall be liable to the owners of such tobacco for any damage or loss such owners may sustain by reason of any partial or total destruction of said tobacco by fire, or water if same shall have been covered by insurance. A reasonable amount for the expense of such insurance coverage may be charged against the account of any person having tobacco for sale or storage in such warehouse; provided, however, that if such insurance coverage be furnished to the owners of tobacco held for sale or in storage in such warehouse, by any selling or commission agent, it shall [not] be necessary for such warehouse to provide such insurance coverage." [4]

The pending motions raise three separate questions concerning the interpretation of this statute, as follows:

1. Does the statute apply to tobacco held for storage following purchase or does it apply only to tobacco stored incidental to its being sold at auction?

2. Is the exception in the proviso clause of the statute applicable to insurance coverage furnished by a purchasing agent as well as to that furnished by a selling agent?

3. If an agent agrees with an owner of tobacco that the owner is to insure such tobacco and if the owner then carries such insurance, has insurance been furnished to such owner within the meaning of the exception contained in the statute?

No Maryland cases have been cited to the Court construing the statute in question. In interpreting this inartfully drawn enactment, this Court would note that the apparent purpose of the statute was to protect growers in Maryland from loss when their tobacco was moved to market for sale or storage. § 51 was part of a comprehensive enactment in 1943 providing for the regulation of tobacco marketing in Maryland. On January 6, 1941, a special committee on marketing Maryland tobacco appointed by the Governor made certain recommendations. Thereafter, in 1942, the Legislative Council of Maryland submitted a research report to the Legislature, elaborating on these recommendations. The statute was enacted the next year.

Admitting that they failed to obtain insurance on the tobacco which was destroyed, Farmer's Warehouse and its proprietors argue first that § 51(a) is inapplicable to them under the facts here because the statute was intended to regulate auction facilities rather than storage warehouses.[5] It is urged that § 51 (a) imposes on warehousemen in Maryland a duty to procure insurance only if they are holding tobacco for sale or for storage incidental to sale. In support of their position, defendants argue that the 1942 Legislative Council Report indicates that when tobacco is brought to a warehouse for an auction sale, the only storage is that incidental to the sale. It should be noted, however, that the Report went further and recommended that for privately owned warehouses, "tobacco be adequately insured while stored

---

4. The word "not" was inadvertently omitted from the last clause of this section when the statute was codified in 1957. See Chapter 98 of the Acts of 1957. The word "not" did appear in the previous codification. See § 60, Art. 48, Md. Ann.Code (1951 Ed.). All parties have conceded the existence of this typographical error.

5. Although defendants repeatedly stress the fact that Farmer's Warehouse did not ordinarily store tobacco beyond the normal period incident to sale, they do not deny that such defendant was acting as a warehouseman in the present case.

there", without suggesting that such insurance should be limited only to coverage for tobacco located at an auction warehouse. Furthermore, the recommendations of the Governor's Committee in 1941 were also phrased in broad terms and proposed that legislation be enacted to require loose-leaf warehouses "to carry insurance to properly protect *all patrons* against fire, theft, storm or other forms of loss". (Emphasis supplied)

The express language of the statute itself likewise does not support the narrow construction urged by the defendants. The statute applies to tobacco held "for sale or storage" and not "for sale or storage incidental to such sale." Under the plain meaning rule of statutory construction, courts are not free to speculate on the intent of the legislature if the words used are free from ambiguity and doubt. Smith v. Higinbothom, 187 Md. 115, 125, 48 A.2d 754 (1946); Caminetti v. United States, 242 U.S. 470, 490, 37 S.Ct. 192, 61 L.Ed. 442 (1916). Were this Court to agree with defendants that the statute is ambiguous and proceed to interpret it in the manner urged, the phrase "or storage" would become redundant and meaningless. It must be presumed that the Legislature intended these two words to have some independent meaning of their own, and it must further be presumed that the Legislature would have made the statute read "or storage incidental thereto" if it had intended that the statute have the meaning ascribed to it by defendants. Applying the plain meaning rule, this Court therefore holds that the statute applies both to auction warehouses and to storage warehouses such as the quonset hut owned by Farmer's Warehouse and destroyed by fire on March 27, 1966.[6]

Defendants' second contention, based on the exception in the statute, is more substantial. Under the proviso clause contained in § 51(a), a warehouseman in Maryland is not required to secure insurance on tobacco held for sale or storage in his warehouse if such insurance "be furnished * * * by any selling or commission agent, * * *." Defendants contend that insurance was in fact furnished here by agreement between General Cigar and its purchasing agent, Lancaster Leaf, and that in any event General Cigar is estopped to rely upon the statute under the facts here.

Under § 51(a), an owner of tobacco held by a warehouseman in Maryland for sale or storage may require such warehouseman in possession of his tobacco to provide the necessary insurance coverage against loss by fire. Although the cost of such insurance must be borne by the owner of the tobacco, the initial responsibility for seeing that there is adequate insurance coverage is placed by the statute on the one in possession, namely, the warehouseman. Only if the owner's agent has "furnished" the necessary coverage is the warehouseman relieved of his statutory responsibility. The principal purpose of the statute is therefore to protect the owner from loss that may occur both before and after sale while his tobacco is stored in a Maryland warehouse out of his possession and control.

Under the proviso clause of the statute, the warehouseman is not required to insure if insurance coverage is furnished by a "selling or commission agent." The plaintiffs argue that if Lancaster Leaf and Free State were agents at all, they were *buying* agents and that any insurance arrangements made by or through either of them would

6. In Export Leaf Tobacco Co. v. American Ins. Co., 260 F.2d 839 (4th Cir. 1958), the Fourth Circuit Court of Appeals reached an analogous conclusion as to a Virginia statute which required tobacco warehousemen to keep insurance "free of charge to the planter and owner of tobacco." Rejecting the contention that the statute was for the protection only of owners who were also planters, the court held that the additional words "and owner" would be rendered meaningless unless both planters and purchasers at auction sales were intended to benefit from the statute. 260 F.2d at 843–844.

not satisfy the express statutory language. The plaintiffs read the statute too narrowly. Considering the language here in the light of the purpose of the statute, this Court concludes that the term "selling or commission agent" would include an agent which purchased tobacco on commission for the account of its principal. If the words "commission agent" are to be accorded any meaning at all, they must be construed as including any agent, whether buying or selling, who is compensated by way of a commission. Indeed, if the words "selling or commission agent" referred only to an agent who *sold* on commission, then there might be considerable merit to defendants' argument that the statute applies solely to tobacco held for sale or for storage incidental thereto. For the reasons previously stated, this construction has been rejected by this Court.

■ Plaintiffs claim that in any event Lancaster Leaf was no more than an independent contractor and was not an agent of General Cigar. The undisputed facts established by the depositions and answers to requests for admission indicate otherwise. In its dealings with Lancaster Leaf, General Cigar set the specifications concerning the price, quantity and quality of the tobacco to be purchased and even sent representatives to help supervise the actual buying operation. After purchase of the tobacco, General Cigar authorized its storage by Lancaster Leaf at facilities maintained by Farmer's Warehouse. Representatives of General Cigar periodically examined the tobacco while it was in storage and determined which quantities of tobacco should be taken from storage and processed by Lancaster Leaf.

In view of these facts, a clear agency relationship existed between the parties. Lancaster Leaf was at all times subject to the control of General Cigar and was acting on behalf of General Cigar as its commission agent within the meaning of § 51(a). See Restatement, Second, Agency, § 1 and § 2, Comment b.[7] Furthermore, Free State was acting in this transaction as Lancaster Leaf's agent and as such became the subagent of General Cigar. See § 5, Restatement, Second, Agency, and in particular, Comment a, Illustration 3, page 22.[8] As Lancaster Leaf had no buying organization, warehouses or packing facilities in Maryland, it necessarily had to hire its own agent in order to be able to perform its contract with General Cigar, and because of the nature of its business in Maryland, Lancaster Leaf was impliedly authorized by General Cigar to appoint Free State subagent. § 80, Restatement, Second, Agency. In any event, it is clear that General Cigar knew that Free State was being employed by Lancaster Leaf to make the purchase and acquiesced in such employment. § 80(d), Restatement, Second, Agency.

Accordingly, this Court finds that both Lancaster Leaf and Free State were commission agents of General Cigar within the terms of the proviso clause of § 51(a). Any insurance coverage "furnished" by them to General Cigar would therefore satisfy the statutory mandate and would relieve Farmer's Warehouse of its responsibility to provide same.

However, neither Lancaster Leaf nor Free State directly took out insurance to cover General Cigar's interest in this tobacco. Instead, Free State agreed with Farmer's Warehouse and Lancaster Leaf that the tobacco would be insured by Lancaster Leaf. Lancaster Leaf in turn agreed with General Cigar (1) that the tobacco in question would be insured by Lancaster Leaf or its agents from the time it was purchased until it was packed, and (2) that as the tobacco was moved into storage after packing, it would be covered with insurance by General Cigar. It is clear that General Cigar acted in accordance with the understanding reached and provided insurance

---

7. As pointed out in § 2, Comment b, even an independent contractor can be an agent for purposes of binding a principal on a contract.

8. The facts here show that Lancaster Leaf and Free State were not acting merely as suppliers. See Restatement, Second, Agency, § 14K.

coverage for the tobacco under policies it had purchased from the insurer plaintiffs, which have raised no question as to coverage but have paid the loss in full.

The question that arises on these facts is whether General Cigar's agent and subagent "furnished" coverage for the tobacco in question within the meaning of the statute so as to relieve Farmer's Warehouse of its statutory obligation to insure. As Judge Dobie noted in Decker v. United States, 140 F.2d 375, 377 (4th Cir.1944), the word "furnish" is "one of very broad and general denotation" and "has always been so interpreted." See also United States v. Erie Basin Metal Products Co., 79 F.Supp. 880, 884 (D.Md.1948).

■■ Under the facts here present, this Court concludes that insurance was indeed furnished or provided the tobacco owner as required by the statutory provision in question. See Webster's Third New International Dictionary, p. 923. Whether the agent takes out the insurance charging the owner for the cost or whether the agent takes steps to see that the owner itself agrees to make the insuring arrangements would appear to be immaterial for the purposes of the statute. The statute recognizes that even if the warehouseman takes out the insurance, the owner is to be charged with the cost. As the owner would be paying for the insurance in any event, undoubtedly its convenience would be served if it selected the insurer and if coverage for its Maryland tobacco were included in its overall insurance program.

Plaintiffs argue that whether or not an owner carries its own insurance, the statute requires a warehouseman to insure tobacco under its control. But from a reading of the statute, it does not appear that the Maryland Legislature was concerned with the party who provided the insurance, so long as there was coverage. Under plaintiffs' construction of the statute, an owner such as General Cigar would have to pay double insur-

ance premiums, once for the insurance that it had agreed to carry and again for insurance taken out by the warehouseman and chargeable to the owner by the statute. As a result of agreement between the parties, insurance was in fact furnished, the conditions of the proviso clause were satisfied and the warehouseman was relieved of liability under the statute. For these reasons, the plaintiffs are not entitled to recover from the defendants because of any violation by Farmer's Warehouse or its owners of the statutory duty imposed by § 51(a).

■ As an alternative ground for dismissal of the third count, this Court concludes that whatever agreements were in fact made, Farmer's Warehouse, the warehouseman, was relieved of its statutory duty to provide insurance when General Cigar, the owner, itself insured the tobacco held by the former in storage. It would be an anomalous result to hold that under the statute insurance furnished by an agent of the owner would relieve the warehouseman of liability while insurance secured by the owner itself would not. As previously indicated, the statutory purpose here was to protect the absent owner from loss while his tobacco was in storage, out of his control. Under the statute then, if the tobacco was uninsured, the warehouseman is responsible for the loss, but if the owner's agent provides the insurance, the warehouseman cannot be liable. A fortiori, if the owner himself insures, the warehouseman should not be required to pay the loss, if not because of any language of the statute, then because of the doctrine of equitable estoppel.

■ Equitable estoppel is based on reliance to the injury of the party invoking the doctrine on the conduct or representations of the person estopped. 10 M.L.E. Estoppel § 22. Here, General Cigar through its agent and subagent, led Farmer's Warehouse to believe that it did not have to provide insurance coverage on the tobacco in question.[9] Farm-

9. Apparently, Farmer's Warehouse had no knowledge of the existence of § 51(a).

However, whether or not Farmer's Warehouse had express knowledge of this par-

er's Warehouse relied to its detriment on the representations made to it by Free State. Accordingly, General Cigar would be estopped to claim damages because of the warehouseman's failure to act.[10]

In support of their contention that they are entitled to summary judgment on the third count, the plaintiffs place heavy reliance on Export Leaf Tobacco Co. v. American Insurance Co., 260 F.2d 839 (4th Cir. 1958). In that case, the plaintiff, Export Leaf, had purchased tobacco at a Virginia auction warehouse owned by the two individual defendants doing business as the Burley Bee Warehouse. Before the tobacco could be moved from the auction warehouse, it was destroyed by fire. Both Export Leaf and Burley Bee were insured, and the insurers of Export Leaf paid to such owner the full amount of the loss. The Court was called upon to decide whether such loss should fall upon the warehousemen's insurer or on the owner's insurers. In an opinion by Judge Sobeloff, the Fourth Circuit held that under a Virginia statute requiring a warehouseman to carry and pay for insurance, the latter's insurer should ultimately bear the loss. In the pending case, the plaintiffs rely in particular on the following language from the opinion, at page 847:

"If Burley Bee had not effected the insurance required by Section 61–132, Export Leaf could, under the statute, have recovered from Burley Bee for the benefit of the insurers of the float-

er policy. Sorenson v. Boston Ins. Co., 4 Cir., 1927, 20 F.2d 640, 641, 642. The insurer of either Export Leaf or of Burley Bee must bear the loss. Since Export Leaf's insurer would not have had to bear the ultimate loss if Burley Bee had not effected insurance, it should not have to bear the ultimate loss because Burley Bee *did* effect insurance in obedience to the law."

There are significant differences between the pending case and *Export Leaf*. There both the owner and the warehousemen carried insurance, and the question before the Court was which insurer should bear the loss. More importantly, the Virginia statute involved in the *Export Leaf* case did not contain the exception set forth in the proviso clause in the Maryland statute, and furthermore, the Virginia enactment flatly provided that the warehouseman should carry and *pay for* the insurance.[11] Under the Maryland statute, the owner is to pay for the insurance, and the warehouseman is relieved of liability if the insurance coverage is furnished to the owner by an agent. In Virginia then, a warehouseman is under a statutory mandate to secure and pay for insurance for its customers whether or not the customer has his own insurance. In Maryland, the warehouseman need not purchase the insurance if the customer is otherwise insured. As the Fourth Circuit pointed out at page 848 of its opinion, to deny recovery in the *Export Leaf* case would

---

ticular statute, it was entitled when promised by Free State that Lancaster Leaf would provide insurance, to refrain from taking reasonable business steps to protect this tobacco, including providing coverage under its own insurance program.

10. Defendants also claim that General Cigar waived its right to proceed under § 51(a). Technically, there could be no waiver here as neither General Cigar nor Lancaster Leaf was aware of the statute, and waiver requires the intentional relinquishment of a known right. 10 M.L.E. Estoppel, § 26. The doctrine to be applied to defeat recovery under the facts here is more accurately described as that of equitable estoppel.

11. Pertinent provisions of the Virginia statute, § 61–132 of the 1950 Code of Virginia, were as follows:

"And the proprietors of every such warehouse shall keep, free of charge to the planter and owner of tobacco, an open policy of insurance upon their respective warehouses, sufficient to cover every loss by fire or water which any person having tobacco stored therein may sustain; and for a failure so to do, they shall be liable to the owners thereof for any damage or loss they may sustain by reason of any partial or total destruction of the tobacco by fire or water."

be to relieve the warehousemen's insurer of the obligation it had assumed under the insurance contract to pay for the loss. Here there is no such insurer defendant, and no such contractual obligation on the part of the defendants to insure the tobacco against loss by fire.[12]

### Negligence and Breach of Contract

In opposing the defendants' motions, plaintiffs further contend that even if they are not entitled to recover under a theory of absolute liability imposed by § 51(a) of Article 48 of the Maryland Code, they should be permitted to proceed to trial and prove that the loss here was occasioned by the defendants' negligence or by their breach of contract. In Counts 1 and 2 of the amended complaints, it is alleged that the defendant Lancaster Leaf both expressly and impliedly promised to purchase, store and process the tobacco in a safe and secure manner and that such defendant breached its promise by carelessly, recklessly, and negligently causing the fire of March 27, 1966. As to the defendants Farmer's Warehouse and its proprietors, the amended complaints allege a breach of a bailment and/or warehousemen's contract in that the tobacco was destroyed while in the defendants' exclusive possession and control.

As discussed hereinabove, there existed between General Cigar and the defendants an agreement that the tobacco in question would be insured by General Cigar. Free State was acting as a subagent of General Cigar when it agreed that while the tobacco was being held by Farmer's Warehouse in temporary storage, it would be insured by Lancaster Leaf. The later agreement between Lancaster Leaf and General Cigar provided that the latter would maintain the insurance after the tobacco was packed and moved into storage. General Cigar's policies clearly contemplated that coverage would be extended to tobacco "purchased for the ultimate account or use by [its]

agent or others or stored in [its] name or in the name of others." The facts therefore establish that as a part of the contract of bailment there was an agreement between the parties that insurance would be provided to cover fire and other losses. Furthermore, it is clear from the record here that the parties intended that liability on the part of the owner's agent or the warehouseman for loss by fire resulting from negligence or breach of contract was to be replaced by such insurance coverage. Indeed, two representatives of General Cigar so testified in their depositions.

██ It has been recognized by numerous authorities that where parties to a business transaction mutually agree that insurance will be provided as a part of the bargain, such agreement must be construed as providing mutual exculpation to the bargaining parties who must be deemed to have agreed to look solely to the insurance in the event of loss and not to liability on the part of the opposing party. In Newport News Shipbuilding & Dry Dock Co. v. United States, 34 F.2d 100 (4th Cir. 1929), the United States had contracted with a shipbuilding company for certain repairs to one of its ships, with the understanding that the government would continue to carry insurance on the hull and machinery while the ship was at the shipyard for repairs. Following loss of the ship because of a fire, the United States sued the shipyard on grounds of negligence and secured a judgment in the district court. In holding that the government's agreement to carry insurance relieved the shipyard of liability for the loss to the extent of the amount of the insurance carried, the Fourth Circuit Court of Appeals said the following at page 106:

"A careful examination of the circumstances leading up to and surrounding the making of the contract must lead to the conclusion that it was

12. In view of the Court's conclusion as to Count 3 of the amended complaints, it is not necessary to consider defendants' further argument that § 51(a) is unconstitutional.

intended by the parties that the United States assumed, by the insurance clause, the risk of loss by fire up to the amount of $2,000,000, and that this assumption of risk was not only for the benefit of the United States, but for the benefit of the shipyard also. To hold otherwise would be to hold that the agreement on the part of the United States to carry the 'present hull, machinery and equipment insurance,' had absolutely no meaning whatever, and was of no value to the shipyard."

In Cerny-Pickas and Co. v. C. R. Jahn Co., 7 Ill.2d 393, 397, 131 N.E.2d 100, 103 (1955), the Supreme Court of Illinois held that an agreement to insure contained in a lease would bar a landlord's subsequent suit against a tenant for negligence and breach of contract. Pointing out that the word "fire" is generally construed to include all fires, whether of negligent origin or otherwise, the Court said the following (131 N.E.2d at page 103):

> "Under the construction urged by the lessor it would be necessary for both parties to the lease to carry fire insurance if they are to be protected. The lessee would have to insure against fires due to his negligence, and the lessor against fires due to other causes * * * The parties contemplated that the risk of loss by fire should be insured against and we see no reason to suppose that they did not contemplate the customary insurance policy which covers both accidental and negligent fires. * * * [W]e conclude that the lessee was not to be liable for loss by fire regardless of the cause of the fire, and that the parties intended that the lessor should look solely to insurance as compensation for damage caused by any kind of fire."

Other cases to the same general effect include General Mills, Inc. v. Goldman, 184 F.2d 359 (8th Cir. 1950), cert. denied, 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683 (1951); Isley v. Bolling Aero Club, Inc., 148 A.2d 717, 719 (D.C.Mun.App. 1959); Rock Springs Realty, Inc. v. Waid, 392 S.W.2d 270 (Mo.1965); Mayfair Fabrics v. Henley, 97 N.J.Super. 116, 234 A.2d 503 (1967). See also Aetna Ins. Co. v. Atlantic Coast Line R. Co., 79 F.2d 463 (4th Cir. 1935).

■ It is further recognized that where as here an insured has entered into a contract which is intended to substitute insurance for personal liability, the insurer is bound by such agreement and may not sue the third party under a theory of subrogation. As the New Jersey Superior Court said in Mayfair Fabrics v. Henley, *supra* (234 A.2d at page 508):

> "Although the right of an insurance company to enforce subrogation rights in appropriate cases has long been well settled, it is also clear that subrogation is not applicable when its enforcement would be inconsistent with the terms of a contract or where the contract, either expressly or by implication, forbids its application."

See also Isley v. Bolling Aero Club, Inc., *supra*; Rock Springs Realty, Inc. v. Waid, *supra*.

■ On the record here, this Court concludes that General Cigar, Lancaster Leaf and Farmer's Warehouse agreed that any loss of the tobacco by fire would be covered by insurance taken out by General Cigar and that the parties contemplated that such risk of loss would be assumed by the insurer and not by any of the parties to the agreement. Under these circumstances, General Cigar is not entitled to recover from the defendants on a theory of negligence or of breach of contract. As subrogees possessing only the same rights against the defendants as did General Cigar, the insurance company plaintiffs must likewise be denied any recovery in these actions. Had the parties agreed as a part of the contract of bailment that the warehouseman should secure and pay for fire insurance on the tobacco, the latter's insurer would hardly have been entitled to recover the amount of its loss on the

theory that such loss was occasioned by the warehouseman's negligence. Nor should the result be different merely because the owner rather than the warehouseman agreed to carry the insurance.

For the reasons stated, plaintiffs' motions for partial summary judgment are hereby denied, and defendants' motions for judgment on the pleadings as to all counts, treated herein as motions for summary judgment, are hereby granted. Counsel are directed to prepare and submit an appropriate order.